

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00156-CV

———————————————

ARLINGTON PROFESSIONAL FIRE FIGHTERS, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL-CIO, LOCAL 1329; DAVID CROW; SHAWN GRAHAM; JOSEPH MARKHAM; EDWARD MONTAGUE; MATTHEW THRONE; AND ADRIAN ROJAS, Appellants

V.

CITY OF ARLINGTON, TEXAS; CITY OF ARLINGTON, TEXAS, CITY COUNCIL; CITY OF ARLINGTON, TEXAS, CIVIL SERVICE COMMISSION; JIM ROSS, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF ARLINGTON; HELEN MOISE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; RALPH GONZALEZ, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; NIKKIE HUNTER, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; ANDREW PIEL, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; REBECCA BOXALL, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; RUBY FAYE WOOLRIDGE,

IN HER OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; VICTORIA FARRAR-MYERS, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; BARBARA ODOM-WESLEY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE CITY OF ARLINGTON, TEXAS, CITY COUNCIL; DON CROWSON, IN HIS OFFICIAL CAPACITY AS ARLINGTON FIRE CHIEF; YOKO MATSUMOTO, IN HER OFFICIAL CAPACITY AS THE ARLINGTON DIRECTOR OF HUMAN RESOURCES AND CIVIL SERVICE; CINDY DAO, IN HER OFFICIAL CAPACITY AS CHAIR OF THE ARLINGTON CIVIL SERVICE COMMISSION; RICK HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ARLINGTON CIVIL SERVICE COMMISSION; JASON KAY, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ARLINGTON CIVIL SERVICE COMMISSION, Appellees[1]

---

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-297772-18

---

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

---

[1]Many of the individuals sued in their individual capacities in the trial court no longer occupy office or hold a position with the City of Arlington. We have modified the style of this matter to reflect the names of their successors. *See* Tex. R. App. P. 7.2(a).

## MEMORANDUM OPINION

## I. Introduction

We are about to begin a long journey together. On its face, the underlying question appears deceptively simple: Did the City of Arlington take improper actions against its firefighters because they sought and obtained voter approval to implement the civil-service system provided in Chapter 143 of the Texas Local Government Code? Appellants[2] claim that the City's actions spawned myriad causes of action, ranging from retaliation claims to constitutional claims to declaratory-judgment claims to a breach-of-contract claim. Our journey is made arduous not only by the number of claims raised but also by subtleties within the discrete elements of the retaliation claims that must be sorted out. When we reach the end of our journey, we will conclude that most of the alleged causes of actions fail and that the trial court committed no error by granting summary judgment in favor of the City. The exceptions to these conclusions are two of Appellants' retaliation claims: The City retaliated against the firefighters by cancelling certain types of discretionary pay previously paid to the firefighters and by failing to promote by denying promotions. We therefore reverse and remand solely as to these two retaliation claims. With respect to the surviving retaliation claims, we further hold that the trial court erred when it held that the association representing the firefighters lacked standing to assert those claims.

---

[2]We explain who the parties are in the background section below.

## II. Factual and Procedural Background

After two unsuccessful efforts, the firefighters of the City of Arlington obtained voter approval of a proposition to implement the civil-service system provided for in Chapter 143 of the Texas Local Government Code. Many of the City's councilmembers made public their opposition to voter approval of the proposition; one of the councilmembers expressed his opposition with more vehemence than the others.

Once the proposition passed, the City began the process of implementing the civil-service system. This process produced several changes to the compensation structure, leave provisions, and promotional scheme that had previously existed for the firefighters. The City and the firefighters offer diametrically opposed views of what motivated the changes. The City states that it was motivated by the need to implement the civil-service system and that Chapter 143 mandated many of the changes that occurred. The firefighters, in essence, claim that the changes were punitive and were a retaliatory response to the rights that they had exercised to convince voters to pass the proposition to provide for civil-service treatment.

The firefighters responded to the City's actions by filing suit. The plaintiffs in the suit were the labor organization representing the City's municipal firefighters—Arlington Professional Fire Fighters, International Association of Fire Fighters, AFL-CIO, Local 1329 (the Association)—and certain individual firefighters who were impacted by a change in the preexisting promotion scheme—Appellants Shawn Graham, Joseph Markham, Edward Montague, Matthew Throne, and Adrian Rojas.

3

The president of the Association, Appellant David Crow, was also a plaintiff. For ease of reference, we will refer to the plaintiffs collectively as Appellants unless there is a need to separately distinguish the Association or an individual Appellant. The defendants were the City and various individuals sued in their official capacities, including the mayor, all city councilmembers, the members of the Civil Service Commission created by the City, the City's fire chief, and the City's director of human resources and civil service. For ease of reference, we will refer to the defendants as the City unless there is a need to distinguish among the individuals.

Appellants' live petition alleged that the Association held associational standing on behalf of its members, and the petition set forth the factual background of the voters' adoption of the civil-service system, the acts Appellants claimed were retaliatory, and how the City's changes in its preexisting promotional scheme impacted the individual Appellants.

The petition alleged ten causes of action:

1. A declaratory-judgment claim seeking a declaration of the rights that the firefighters had under the provisions of the Local Government Code to be promoted under the preexisting promotional scheme of the City, along with injunctive relief related to "the improper limitations on employees' consideration for promotion, as well as prohibiting promotional interviews and the requirement that employees undergo drug and alcohol testing before participating in the same."

2. A mandamus claim stating that a writ of mandamus was necessary because the City's director of human resources and the fire chief had violated a ministerial duty to promote firefighters in accordance with the provisions of the Local Government Code.

4

3. A breach-of-contract claim predicated on the City's alleged violation of a standard operating procedure governing the promotion of firefighters.

4. An equal-protection claim predicated on the City's disparate treatment of certain firefighters versus similarly situated firefighters.

5. A claim that the City had violated the firefighters' free-speech rights under the Texas Constitution by taking actions that deterred City employees "from exercising their constitutional right to freedom of speech."

6. A claim that the City had violated the firefighters' due-course-of-law rights under the Texas Constitution by annulling the preexisting promotional policy without providing the affected firefighters with process.

7. A claim that the City had violated the firefighters' assembly rights under the Texas Constitution by annulling the promotional lists created under the City's preexisting policy and by eliminating and reducing other benefits that the firefighters had previously been given.

8. A claim that the City had retaliated against the firefighters for exercising their rights to speak, to assemble, and to petition under the Texas Constitution when they "petition[ed] the government for a referendum to determine whether the City's citizens wanted to apply Chapter 143 to [the Arlington Fire Department]" and when the firefighters "[spoke] in favor of that petition, [Appellants] engaged in protected conduct, including speech, on matters of public concern."

9. A declaratory-judgment claim that the City had violated the provisions of the Local Government Code when it "reduc[ed] [the Arlington Fire Department] personnel's vacation[-]leave benefits, without making a commensurate reduction in other municipal employees' vacation[-]leave benefits," violating Local Government Code Section 142.0013.

10. A declaratory-judgment claim that "[b]y supporting the management-friendly association (the so-called 'stakeholder committee') and by dominating and interfering with the administration of [the Association], the City has violated the rights of [Appellants] under Texas Labor Code Section 101.001 and Texas Government Code Section 617.005."

The petition's prayer sought a host of other declarations, mandamus relief, injunctive relief, and damages.

After discovery, the City responded to Appellants' claims with a battery of motions for partial summary judgment that attacked the various causes of action alleged in Appellants' petition:

1. A traditional motion seeking to have the trial court "dismiss [Appellants'] claims for mandamus, Equal Protection, Freedom of Speech, Freedom of Assembly[,] and Due Course[ ]of Law";

2. A traditional motion praying that "[Appellants'] breach[-]of[-]contract [claim] be dismissed with prejudice"; and

3. A traditional and no-evidence motion seeking dismissal of Appellants' declaratory-judgment, retaliation, and money-damages claims with prejudice.

Appellants filed detailed responses to the City's motions, and the City filed two replies.

The trial court granted each of the City's motions for partial summary judgment. Appellants sought clarification of whether the trial court had ruled on their declaratory-judgment claim based on the new vacation-leave policy, and the City responded to this motion by asserting that its motions had addressed this cause of action. The trial court then entered a final judgment stating that Appellants had withdrawn their motion for clarification and decreeing that "[Appellants] take nothing against [the City]." Appellants filed a notice of appeal and an amended notice of appeal.

### III. Summary of Appellants' Issues and Our Resolution of the Issues

On appeal, Appellants' presentation of their issues reorders the causes of action from the sequence in which they were alleged in their petition. As Appellants present

6

their issues, they state a central core of the facts that form the bases of their complaints against the City and then enumerate the specific errors that they contend the trial court committed by granting summary judgment. To capture Appellants' sequence and detail of the issues involved in this appeal, we quote Appellants' "Issues Presented" section in its entirety and notate in braces our ultimate resolution:

> In response to [the City's] motions for summary judgment, Appellants argued to the trial court that the City of Arlington and its officials answered Appellants' support for a civil[-]service referendum with a campaign of retaliation, including the nullification of valid promotional lists and cuts to pay and leave, in violation of the Texas Constitution's protected rights to speech, assembly, equal protection, and due course of law. Appellants argued that summary judgment was warranted neither for their constitutional claims nor for their claims that those same retaliatory acts violated Chapter 143 of the Local Government Code, violated their rights under Texas Labor Code Section 101.001 and Texas Government Code Section 617.005, constituted breach of contract, and entitled them to a writ of mandamus enforcing the nullified promotions. The trial court, however, entered summary judgment in [the City's] favor, based on a field of varied legal and factual arguments. Thus, the issues presented are [as follows]:
>
> > 1. Regarding Appellants' retaliation claim[s], did Appellants present more than a scintilla of evidence that they (1) endured adverse actions that were (2) motivated by retaliatory animus?
> >
> > {We sustain in part Appellants' first issue and hold that the trial court erred by granting summary judgment on two of Appellants' retaliation claims—the cancellation of certain types of discretionary pay previously paid to the firefighters and by denying promotion or refusing to promote.}
> >
> > 2. If so, does [the Association] – aside from the individual Appellants – possess associational standing to seek a

7

declaratory judgment as to the City's department-wide retaliation?

{We sustain part of Appellants' second issue and hold that the trial court erred by granting summary judgment that the Association lacked standing to pursue the two retaliation claims upheld in Appellants' first issue because the City's motion for summary judgment failed to adequately raise this ground.}

3. Regarding Appellants' claim seeking a declaratory judgment that nullification of valid promotional lists violated Chapter 143 of the Texas Local Government Code, can summary judgment be sustained on either of [the City's] arguments that[] (1) Chapter 143 prohibits promotion from preexisting, valid promotional[-]eligibility lists, or (2) Appellants failed to exhaust administrative remedies?

{We overrule Appellants' third issue and hold that the trial court properly granted summary judgment.}

4. Regarding Appellants' claim seeking a declaratory judgment, does the creation of a management-driven "stakeholder committee" interfere with and violate Appellants' rights under Texas Government Code § 617.005 and Labor Code § 101.001?

{We overrule Appellants' fourth issue and hold that the trial court properly granted summary judgment.}

5. Regarding Appellants' claim for a writ of mandamus, did [the City] have a legal duty to promote from the valid promotional lists under Chapter 143 of the Texas Local Government Code, and, if so, did the appeals process for limited types of civil[-]service "decisions" under Chapter 143 permit the Appellants an adequate remedy at law?

{We overrule Appellants' fifth issue and hold that the trial court properly granted summary judgment.}

8

6. Regarding Appellants' claim under . . . Article I, Section 3 of the Texas Constitution, are Appellants similarly situated to other employees of the City of Arlington, such as [d]eputy [c]hiefs, and if so, what standard of review should apply and, under that standard of review, did [the City] carry [its] burden to establish a government interest that warrants judgment as a matter of law?

{We overrule Appellants' sixth issue and hold that the trial court properly granted summary judgment.}

7. Regarding Appellants' claim under Article [I], Sections 8 and 27 of the Texas Constitution, was [the City's] argument that the ordinances, which cut benefits exclusively for those who had exercised their rights of assembly and speech, did not explicitly regulate speech sufficient to warrant summary judgment?

{We overrule Appellants' seventh issue and hold that the trial court properly granted summary judgment.}

8. Regarding Appellants' claim under Article [I], Section 9 of the Texas Constitution, are declaratory judgments specifically limited to statutes and ordinances under Chapter 37 of the Texas Civil Practice & Remedies Code, and if not, does a City violate an employee's rights to due course of law by eliminating established promotional lists, contrary to its own established policy, and without permitting any recourse?

{We overrule Appellants' eighth issue and hold that the trial court properly granted summary judgment.}

9. Regarding Appellants' claim for breach of contract, did the Appellants present sufficient evidence of the [City's] contractual intent when City officials assured Appellants in writing that the existing promotional lists would remain in effect until October 30, 2017?

{We overrule Appellants' ninth issue and hold that the trial court properly granted summary judgment.}

9

## IV. Standards of Review

In a summary-judgment case, the issue on appeal is whether the movant met the summary-judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We also consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005).

A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff

to come forward with competent controverting evidence that raises a fact issue. *Phan Son Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for a no-evidence summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine, material fact issue. *See* Tex. R. Civ. P. 166a(i) & 1997 cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller*, 168 S.W.3d at 822). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*,

11

288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

## V. Analysis

### A. The trial court erred by granting summary judgment as to two of Appellants' retaliation claims.

#### 1. Elements of a retaliation claim

Appellants' first issue challenges the trial court's granting of summary judgment on their claim that the City retaliated against them for exercising their free-speech, associational, and petition rights under the Texas Constitution.[3] Appellants identify the elements of their retaliation claim as follows: (1) they suffered an adverse employment action; (2) their speech involved a matter of public concern; (3) their interest in commenting on matters of public concern outweighed their employer's interest in promoting efficiency; and (4) their speech motivated the adverse employment decision. *See Caleb v. Carranza*, 518 S.W.3d 537, 544 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001)). The City's brief does not challenge all the elements enumerated by Appellants. Instead, the City's motion for partial summary judgment focused on two of these elements:

---

[3]The City does not challenge that Appellants were exercising these constitutional rights. The rights of a public employee to associate with a union or similar organizations is an exercise of analogous First Amendment rights. *See Mote v. Walthall*, 902 F.3d 500, 505–09 (5th Cir. 2018); *Hitt v. Connell*, 301 F.3d 240, 245 (5th Cir. 2002); *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 749 (5th Cir. 1993) (quoting *Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258, 262 (5th Cir. 1984)).

12

Appellants had suffered no adverse employment action, and Appellants had failed "to adduce more than a scintilla of evidence that demonstrates that their exercise of constitutionally[ ]protected conduct motivated an adverse employment action."

## 2. How we determine whether an action constitutes an adverse employment action

The initial question that we must address is what standard to apply to determine whether the City's actions constituted an adverse employment action—a question complicated by courts' differing views on the issue. Appellants argue that the action is adverse if it might dissuade a reasonable worker from engaging in protected conduct. This standard contrasts with a more traditional view of an adverse employment action that looks to more defined categories of actions, such as whether there was a discharge, demotion, refusal to hire, refusal to promote, or reprimand. Appellants acknowledge that their "material adversity" standard arises from the United States Supreme Court's opinion in *Burlington Northern & Santa Fe Railway Co. v. White* that created the standard in the context of a Title VII claim.[4] 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2005). Appellants cite no Texas case that has explicitly applied the material-adversity standard to a retaliation claim based on speech and association rights but argue that because Texas cases extend the standard to other contexts, it should be similarly extended to a retaliation claim.

---

[4]Title VII of the Civil Rights Act of 1964 addresses employment discrimination claims. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 478 (Tex. 2001).

Though not cited by Appellants, one Texas case from the El Paso Court of Appeals holds—without analysis—that the material-adversity standard applies to a First Amendment retaliation claim. *See Nairn v. Killeen ISD*, 366 S.W.3d 229, 244 (Tex. App.—El Paso 2012, no pet.) ("An adverse employment action is one that a reasonable employee would find to be 'materially adverse,' *i.e.*, 'the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination' under federal law." (citing *Burlington*, 548 U.S. at 57, 126 S. Ct. at 2409)). The Waco Court of Appeals disagreed with the El Paso Court of Appeals and followed what it viewed as the prevailing Fifth Circuit standard, holding that an adverse employment action should be delimited by the more defined categories of actions and not the more general standard derived from *Burlington*:

> *Burlington* did not address the standard for adverse employment actions in First Amendment retaliation cases; instead, it involved Title VII's antiretaliation provision. *See* [548 U.S.] at 56–57, 126 S. Ct. at 2408–09. The Fifth Circuit has not yet determined whether the *Burlington* standard for adverse employment actions applies to First Amendment retaliation cases. *See Gibson v. Kilpatrick*, 734 F.3d 395, 400 n.4 (5th Cir. 2013), *vacated on other grounds*, [573 U.S. 942] (2014). Likewise, the Texas Supreme Court has not addressed the issue. *Cf. Montgomery* [*Cty.*] *v. Park*, 246 S.W.3d 610, 614 (Tex. 2007) (adopting *Burlington* standard with appropriate modifications to define what qualifies as "adverse" personnel action within meaning of Texas Whistleblower Act). We therefore apply the Fifth Circuit's precedent that, for purposes of First Amendment retaliation claims, "adverse employment actions" are discharges, demotions, refusals to hire, refusals to promote, and reprimands. *See Juarez* [*v. Aguilar*], 666 F.3d [325,] 332 [(5th Cir. 2011)] (citing *Sharp v. City of Hous*[.], 164 F.3d 923, 933 (5th Cir. 1999)); *Pierce* [*v. Tex. Dep't of Criminal Justice, Institutional Div.*], 37 F.3d [1146,] 1149 [(5th Cir. 1994)].

14

*Tex. A&M Univ. v. Starks*, 500 S.W.3d 560, 573–74 (Tex. App.—Waco 2016, no pet.)

(footnotes omitted). Cases decided after *Starks* analyzing the state of the law in the

Fifth Circuit indicate that the Fifth Circuit still considers it an open question regarding

what constitutes an adverse employment action in the context of a First Amendment

discrimination claim. *See, e.g.*, *Johnson v. Halstead*, 916 F.3d 410, 422 n.5 (5th Cir. 2019)

(op. on reh'g).[5] We will follow *Starks* and look to the categories defining when an action

is an adverse employment action.

---

[5]As *Johnson* noted,

> First Amendment retaliation claims also may differ from [S]ection 1981 retaliation over the definition of an "adverse employment action." It is not clearly established whether *Burlington*'s "materially adverse" standard applies to retaliation for protected speech. *See Gibson . . .* , 734 F.3d [at] 401 n.4 . . . ("[T]his court has not yet decided whether the *Burlington* standard for adverse employment actions also applies to First Amendment retaliation cases.") . . . ; *DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009) (finding that the application of *Burlington* to First Amendment retaliation is not "clearly established")[, *abrogated on other grounds by Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018)]. Because our decision is based on whether Johnson spoke as a citizen, we need not address whether his transfer would meet the stricter "ultimate employment action" test. *Id.*; *see cf. Sanchez v. Presidio Cty., Tex.*, No. P:19-CV-037-DC, 2021 WL 2562252, at *4 (W.D. Tex. June 20, 2021) (order adopting report & recommendation) ("However, persuasive authority within the Fifth Circuit indicates that the Fifth Circuit may have impliedly adopted the *Burlington Northern* standard for § 1983 cases." (citing *Garrett v. Judson ISD*, 299 F. App'x 337, 346 (5th Cir. 2008), and *Simonelli v. Fitzgerald*, Nos. SA-07-CA-360, SA-08-CA-648, 2009 WL 3806489, at *5 (W.D. Tex. Oct. 22, 2009) (order))).

### 3. Our resolution regarding which of the City's actions constitute adverse employment actions

#### a. The City's failure to promote constitutes an adverse employment action.

The first adverse employment action that Appellants contend occurred was the failure to promote five of the individual Appellants and other similarly situated firefighters.[6] These firefighters had been placed on promotion lists created under an operating procedure in effect before the voters of Arlington adopted the civil-service system for firefighters or were performing the job duties associated with a promotion. After the voters adopted the civil-service system for the firefighters, Appellants allege that the City continued to test for promotions in accordance with the then-existing procedure. The promotional lists generated by the then-existing procedure produced promotional lists that remained effective after the date that the City was required to implement the civil-service system for the firefighters. Appellants also contend that the City represented that it would use the then-existing promotional lists to fill vacancies that arose before the date that the civil-service system was implemented. As Appellants'

---

[6]Resolving the claims of the individual Appellants who sued to challenge the fact that they were not promoted is complicated by the fact that although the petition listed five individuals asserting this claim, the summary-judgment proof on the failure to promote includes affidavits from only four of the individual Appellants. The affidavits establish which promotional list the affidavit-filing individuals were on and that three of the four were eventually promoted. Piecing together other evidence in the record, it appears that the other individual, Appellant Graham, was on a promotional list that was subsequently withdrawn and that he was not later promoted.

16

summary-judgment evidence shows, five of the individual Appellants were on various promotion lists.[7]

Appellants contend that the City reversed course on the procedure that it appeared to be following for promotions. Specifically, less than a month before the implementation of the civil-service system, the City's newly created Civil Service Commission acted on the recommendation of the fire chief to implement several actions regarding promotions. The commission ratified promotions made in the eleven months preceding the commission's vote and concluded that the promotions had been done in substantial compliance with Chapter 143. The commission also "declare[d] that all current active promotional lists for [l]ieutenant, [c]aptain, and [a]pparatus [o]perator . . . for the Arlington Fire Department [would] be null and void" as of the date of the commission's October 3, 2017 vote.

Three of the individual Appellants who were on the promotional lists for captain, lieutenant, and apparatus operator that existed before the commission's actions—Montague, Markham, and Throne—were ultimately promoted. The City's evidence indicated that these three received a pay increase as a result of their promotions. Two of the individual Appellants, Graham and Rojas, were not promoted. According to the City's summary-judgment evidence, these two had failed to score high enough on a

---

[7]The evidence reflects that Montague was on the promotion list for lieutenant, Markham was on the promotion list for apparatus operator, Rojas was serving "out-of-class" as an apparatus operator, Throne was on a promotion list for captain, and Graham was on a promotion list for captain.

17

civil-service promotional exam for the promotions they sought. They had not been demoted from the positions they held before the implementation of the civil-service system. The City also presented evidence that all the positions in question had received substantial pay increases in the period since the implementation of civil service.

The narrow question we face at this point is whether the failure to promote or the delay in promotion is an adverse employment action. The City argues that there could be no adverse employment action because promotions for Montague, Markham, and Throne were only delayed and because Graham and Rojas, who were not promoted, had failed to score high enough on the civil-service exam after the civil-service promotional scheme was implemented and that it was necessary to implement the new promotional scheme as part of the transition to civil service. But that argument begs the question of whether the failure to promote in and of itself is an adverse employment action and goes more to the questions of causation dealing with the motivation of the action and of whether the action promoted efficiency, which is a different element of Appellants' retaliation claim. As a general proposition, a "[f]ailure to promote is clearly an adverse employment action." *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 364 (5th Cir. 2013) (dealing with discrimination claim under Civil Rights Act of 1964); *Smith v. Harris Cty.*, No. 01-18-00247-CV, 2019 WL 1716418, at *4 (Tex. App.—Houston [1st Dist.] Apr. 18, 2019, no pet.) (mem. op.) (citing *Haire* when discussing an adverse employment action in the context of retaliation claims under the Texas Commission on Human Rights Act).

18

A delay in promotion also may be an adverse employment action when a delay is not cured by actions that "undo" the effect of the delay. A federal district court in Louisiana recently discussed the question of whether a delay in promotion when the employee does not receive compensation that resulted from the delay is an adverse employment action and concluded that it was under the facts presented:

> As to the third aspect of the prima facie case, the Secretary takes issue with whether "denial of a desk audit" is an adverse employment action. But that is an oversimplification[,] and semantics do not dictate the presentation of issues in this case. More than being denied a desk audit, the facts in the record show that [the employee's] promotion to a higher paying job was delayed[] and that he was denied back pay once the promotion was effectuated. To be sure, a delay in a promotion, unaccompanied by any adverse effects, is not necessarily an adverse employment action. *See Benningfield v. City of Hous*[.], 157 F.3d 369, 378 (5th Cir. 1998) ("[W]e need not address whether a mere delay in promotion constitutes an adverse employment action because [the employee] received the promotion with retroactive pay and seniority."). But, here, it is undisputed that [the employee's] promotion was delayed **and** [that] he was denied back pay, which the case literature acknowledges is an adverse effect. *See id.*; *see also Dailey v. Whitehorn*, 539 [F. App'x] 409, 411–12 (5th Cir. 2013) (finding that the plaintiff cannot show adverse employment action in delayed promotion scenario where there was no accompanying adverse effect such as change in salary); *see also Mylett v. City of Corpus Christi*, 97 [F. App'x] 473, 475 (5th Cir. 2004) ("A delay in promotion is not an adverse employment action where any increase in pay, benefits, and seniority are awarded retroactively."). There is no factual controversy that [the employee] performed work consistent with a higher paying position for some time, but his technical promotion and reclassification were delayed by his employer, then back pay was denied; the adverse effect of the denial of back pay, which accompanied the delay in promotion, rises to the level of an adverse employment action. He has satisfied this element of his prima facie case.

*Sterling v. Bernhardt*, No. 17-0742, 2019 WL 1238958, at *9 (E.D. La. Mar. 18, 2019) (order) (footnotes omitted). Thus, a delay in promotion can be an adverse employment

19

action if the employee is not compensated for the benefits that accrued during the period of the delay. The City does not claim that it compensated the three individual Appellants whose promotions were delayed for the seniority that they would have received if they had been promoted when they claim they should have been; thus, the failure to promote or delaying a promotion constitutes an adverse employment action regarding the individual Appellants and other similarly situated firefighters under the record before us.

**b. The City's elimination of certain classes of discretionary pay constitutes an adverse employment action.**

The next issue involves whether the City's elimination of certain types of discretionary pay constitutes an adverse employment action. As part of the implementation of the civil-service system, the City passed an ordinance that specified the types of specialty pay available to firefighters. *See* Arlington, Tex., Ordinance 17-065 (Oct. 17, 2017). The City's motion for partial summary judgment challenging Appellants' retaliation claims readily acknowledged that the City had eliminated certain types of pay that had existed prior to the implementation of civil service but claims that it did so to offset the cost of implementing the civil-service system. Specifically, the City argued that "[t]he only difference between the types of premium pay available to [the Association's] employees from the prior framework is that firefighters can no longer obtain EMT-I Pay, Swing Pay[,] and Education Pay. The elimination of these types of premium pay was required to meet budget constraints." In a PowerPoint presentation

prepared by the director of human resources and civil service, the City quantified the values assigned to the various types of discretionary pay that were cut as follows: (1) EMT-I = $396,600; (2) Swing Pay = $12,500; and (3) Education Incentive = $59,700.

The parties each devote a scant one paragraph to the question of whether these alterations in the firefighters' pay structure constituted an adverse employment action. Appellants argue that pay reductions fit into the set of categories constituting an adverse employment action, and we agree with that characterization. As noted above, the usual Fifth Circuit formulation of these categories is as follows: "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *See Juarez*, 666 F.3d at 332. Another circuit includes reductions in pay in the category of adverse employment actions. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225–26 (2d Cir. 2006) (stating that "[i]n the context of a First Amendment retaliation claim, we have held that '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action,'" and that in this context, "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand"); *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (defining adverse action to include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand"), *abrogated on other grounds by Montero v. City of Yonkers, N.Y.*, 890 F.3d 386 (2d Cir. 2018). Thus, we conclude that a reduction in pay is an adverse employment action.

The authority relied on by the City challenging that a reduction in pay should not be considered an adverse employment action is not persuasive. The City cites *Dorsett v. Bd. of Trs.*, 940 F.2d 121, 123 (5th Cir. 1991). *Dorsett* expressed the Fifth Circuit's concern that it should not become involved in micromanaging faculty appointments at educational institutions. *Id.* at 124. The Fifth Circuit simply would not involve itself in matters such as "teaching assignments, pay increases, administrative matters, and departmental procedures." *Id.* at 123. *Dorsett* hardly supports the City's proposition that the multi-hundred-thousand-dollar reduction in firefighter discretionary pay cannot be "an adverse employment action as a matter of law."

Accordingly, we hold that the reductions in pay constituted adverse employment actions as a matter of law.

### c. The City's actions with respect to vacation- and sick-leave benefits do not constitute adverse employment actions.

Next, Appellants assert that the City committed another adverse employment action when it effectuated actions that impact the pre-civil-service status of the firefighters' vacation and sick-leave policies. The City's actions took the form of two ordinances. The ordinance impacting the sick-leave policy contained the following provision that, in essence, limited the uses to which sick leave that had accrued before the implementation of the civil-service system could be put:

> Any sick[-]leave balance that is greater than 180 hours (2912/24 hr. personnel) and 120 hours (2080/40 hr. week personnel) and is recorded prior to implementation of [c]ivil [s]ervice for qualified firefighters

22

regularly assigned to the firefighter prevention and suppression classification shall be frozen for the respective employee. Each frozen sick[-]leave account containing balances accrued prior to implementation of [c]ivil [s]ervice shall be recorded and maintained by the City of Arlington. The frozen sick[-]leave balance shall be made available to the respective employee upon request for a qualifying Family Medical Leave Act (FMLA) event. Eligibility to access the frozen sick[-]leave account requires that all sick leave, vacation, and holiday hours earned at the time of the request and provided under [c]ivil [s]ervice pursuant to Texas Local Government Code Chapter 143 have been exhausted.

*See* Arlington, Tex., Ordinance 17-067 (Oct. 17, 2017). Appellants characterize the ordinance as having the following effect:

Similarly, banked sick leave can now only be used after vacation and holiday time is exhausted *and* – importantly – can only be used for "qualifying Family Medical Leave Act (FMLA) event[s]." In other words, banked sick[-]leave hours may only be used for incapacity for three consecutive days or more, incapacity for pregnancy-related events, and incapacity for chronic serious health conditions. [Record reference omitted.]

With respect to vacation pay, the City passed another ordinance that noted a provision of Chapter 143 allowed a firefighter who is classified as an employee to accrue fifteen days of vacation pay per year and "[did] not allow a firefighter to accumulate vacation leave from year to year unless approved by the municipality's governing body . . . ." This ordinance, in essence, calculated the firefighters' vacation-leave balances using the fifteen-day limit and then placed the vacation leave that had accrued under the preexisting policy into a bank to be paid upon separation:

That, on or before October 30, 2017, a calculation of the vacation balances of the Fire Department employees assigned to the fire suppression and fire prevention classifications will be taken to record the number of hours for each, before subtracting the number of vacation hours each is eligible for based on tenure at the time of the calculation. The remaining hours

23

of vacation for each will then be recorded for the purposes of calculating the terminal pay due to the employee upon separation. This accounting of the vacation hours prior to implementation of [c]ivil [s]ervice will be retained for the duration of the employee's tenure and converted into a dollar amount based on the employee's base rate of pay at the time the [c]ivil[-s]ervice law was implemented and will be paid as terminal pay for the employee at the time of separation or, upon promotion into the management classification, converted back to hours, merged with the employee's [c]ivil[-s]ervice leave balances, and managed through the City's personnel policy regarding vacation leave.

*See* Arlington, Tex., Ordinance 17-066 (Oct. 17, 2017).

The City argues that neither ordinance constitutes an adverse employment action because the new sick-leave and vacation policies conform to the standards of the civil-service statutes and that the firefighters lost nothing as a result of the changes.

With respect to the change in the sick-leave policy, the City defends the ordinance it passed by arguing that no firefighter lost any accrued sick leave and that the ordinance conforms to the section of the Local Government Code that provides that "[a] fire fighter . . . may accumulate sick leave without limit and may use the leave if unable to work because of a bona fide illness." *See* Tex. Loc. Gov't Code Ann. § 143.045(b). With respect to the vacation-pay ordinance, the City again argues that the change was mandated by a provision of the Local Government Code and that the firefighters actually benefited from the change because they are now required to take their vacation annually.

With respect to the sick-leave balance, the City's argument ignores that it has apparently superimposed a requirement that it does not argue is imposed by the Local

24

Government Code—the requirement that access to the frozen sick-leave account "requires that all sick leave, vacation, and holiday hours earned at the time of the request and provided under [c]ivil [s]ervice pursuant to Texas Local Government Code Chapter 143 have been exhausted." With respect to the vacation-pay change, the City ignores that the provision of the Local Government Code prohibiting the accumulation of vacation pay from year to year also qualifies the prohibition by stating the rule applies "[u]nless approved by the municipality's governing body." *See id.* § 143.046(c). Thus, the City's claim that it was only implementing changes mandated by the Local Government Code is not correct.

But on the question of whether the banking of previously accrued benefits may constitute an adverse employment action, the parties do not cite us to a Texas or a Fifth Circuit case on point. The Sixth Circuit, however, has written on the issue. In *Adair v. Charter County of Wayne*, a case involving retaliation under the Fair Labor Standards Act, the Sixth Circuit dealt with the question of whether a change in the use of banked time constituted an adverse employment action. 452 F.3d 482, 490 (6th Cir. 2006). The Sixth Circuit held that situations such as requiring employees to use vacation days for vacation rather than allowing them to bank the days or freezing the accumulation of overtime pay were not adverse employment actions:

> [The employees] finally complain that the freeze on accumulation and use of banked compensatory time was an adverse action. This did not result in a material loss of benefits, termination, demotion, transfer, or alteration of job responsibilities. [The employees] simply were required to utilize vacation days for just that—vacation—rather than permitted to save

25

vacation time and later exchange it for pay. Moreover, the [employer] did not deprive [the employees] of any benefit by freezing the accumulation of overtime pay; now officers working overtime receive pay instead of earning comp time. [The employees] fail to prove that the actions taken by the [employer] were materially adverse.

*Id.* Appellants cite us to a subsequent Sixth Circuit retaliation case that relied on the more liberal standard of whether an action would chill or silence a person of ordinary firmness and that held the discontinuance of a banked-time system was an adverse employment action. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 304 (6th Cir. 2012). In *Dye*, the alteration of the banked-time system deprived the employee of a steady income, and *Dye* concluded that this circumstance created an adverse employment action. *Id.*

As we follow the more limited definition of what constitutes an adverse employment action, we conclude that the alterations in the firefighters' compensation and benefits created by the ordinances dealing with their vacation and sick leave do not fall in the usual categories defining an adverse employment action and are not sufficiently material to constitute adverse employment actions.

### 4. There is more than a scintilla of evidence that the City acted with a retaliatory animus.

Appellants next argue that the trial court erred by granting a no-evidence summary judgment on the question of whether the City acted with a retaliatory animus. We hold that the record contains more than a scintilla of evidence that retaliatory animus motivated the City in taking those actions that we have concluded constitute adverse employment actions.

a. **We conclude that there is evidence of retaliatory animus.**

Of the three employment actions that Appellants claim are adverse employment actions, only two actions have survived our immediately preceding analysis of what constitutes an actionable employment action: the failure to promote from then-existing promotion lists and reductions in discretionary pay. After review of Appellants' arguments about why there is a fact question regarding whether these actions were taken with a retaliatory animus and the City's counterarguments, we conclude that the trial court erred by granting summary judgment.

Appellants claim that the City's explanations were pretextual. As Appellants note, this court has held that in cases asserting a cause of action similar to their retaliation claims, it is a general proposition that summary judgment is often inappropriate to resolve fact-intense questions of motive and intent. *See Hall v. RDSL Enters. LLC*, 426 S.W.3d 294, 301 (Tex. App.—Fort Worth 2014, pet. denied). Also, in an analogous case, the Eastland Court of Appeals has held that animus may be proven by direct or circumstantial evidence:

> Texas courts recognize two methods of proof in discriminatory treatment cases. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012) (citing *Quantum Chem. Corp. . . .* , 47 S.W.3d [at] 476 . . . ). The first is proof by direct evidence; the second is proof by indirect or pretext evidence. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, [1824] (1973). Direct evidence, if believed, proves the fact of discriminatory animus without inference or presumption. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). But proof through direct evidence is difficult. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, [1482] (1983) (seldom is there an eyewitness to [an] employer's mental processes evincing discriminatory intent); *see also*

*Mission Consol.*, 372 S.W.3d at 634 (covert motives make direct forbidden animus "hard to come by"). When there is no direct evidence, discrimination can be proven indirectly by the "pretext" method. *See McDonnell Douglas*, 411 U.S. at 802–05, 93 S. Ct. [at 1824–26].

*Dell, Inc. v. Wise*, 424 S.W.3d 100, 109 (Tex. App.—Eastland 2013, no pet.).

As to reductions in certain types of discretionary pay that occurred in the form of the elimination of EMT-I pay, swing pay, and education pay, there is both direct and circumstantial evidence of the city council's attitude toward the proposition put before the voters to give the firefighters civil-service treatment. The most vocal councilmember who opposed the civil-service referendum expressed to his constituents in a blog post that discretionary pay would need to be eliminated if Appellants gained civil-service treatment:

> During the last two years[,] housing values have risen. This increase has allowed the [C]ity to give much needed raises to our staff. In this instance[,] the firemen have received the biggest slice of the pie[,] and their respective pay checks have risen above those of commensurate positions in other cities. This apparently is not enough. They want the Chief replaced. So the Council has given the firefighters a good job, in a good city, with a very nice wage, allowing them a very nice standard of living while only requiring a high[-]school degree. The Council has been sympathetic to the union in the past. We responded to the publishing of "The Book" by accomplishing an audit. The Chief was exonerated. Then a survey was ordered by [the] Council. The Chief responded to the results, but the union did not. Now it is [c]ivil [s]ervice that the union wants. This is a slap in the face to the Council. If [c]ivil [s]ervice is established[,] the following will happen:
>
> > 1. All firefighters in the same civil[-]service classification will be entitled to the same base pay. Any additional pay will be at the behest of the City Council.
> >
> > 2. Longevity or [s]eniority pay will be removed.

28

3.  No 401K.

4.  Assignment pay will be removed.

5.  Educational and fitness pay will be removed.

6.  Shift differential pay will be removed.

7.  Swing pay will be removed.

8.  15 days of sick leave will be allowed each year.  A 90[-]day maximum lump[] can be paid upon retirement.  (Previously 180 days)

9.  15 days of vacation each year is allotted.  No carry over is allowed from year to year.

10.  No allocation of pay for union business.

All of the above have been granted in the past by [the] Council.  I for one will not be voting to reinstate any of them.  If the union wants civil service[,] then that is what they will get, not a hybrid of the current philosophy and civil service.  If the union has a problem with their Chief[,] it should be resolved in house and not put on display to the citizens.  If they can't live with the result of having the current Chief in his position, then there are other fire departments all over the [m]etroplex that [they] can transfer to.  For a union to be so concerned about W-2, it would seem that with this move[,] power is the real motivator, and if it costs dollars to its members[,] so be it.

Other councilmembers and the mayor placed their names on mailers sent to voters that, in essence, stated that the effort to pass civil-service treatment was a "union" takeover.

What follows are the two mailers of two pages each that are included in our record:[8]

---

[8]Certain of the councilmembers placing their names on the mailer are no longer on the council.  These councilmembers and others were sued in their official capacities.  We have substituted the councilmembers and others now occupying the positions of the defendants no longer in office or holding a position with the City.  *See* Tex. R. App. P. 7.2(a).



# DON'T BE FOOLED.
## PROPOSITION 2 DOESN'T HELP FIREFIGHTERS.

### IT FORCES YOUR TAX DOLLARS
### TO PAY FOR LABOR UNION BENEFITS.



DEPOSITION
EXHIBIT
12
2.19.19

Dear Arlington neighbor,

You may have seen all the campaign signs around town urging you to vote Yes for Proposition 2. Don't be fooled. These are a ploy by a labor union political action committee to mislead voters.

The fact is Proposition 2 is not about helping firefighters. It doesn't increase their pay, and it doesn't improve public safety. Instead, it forces labor unions on Arlington's fire department, and gives union bosses just as much, if not more, authority as our award-winning Fire Chief.

What does this mean to Arlington taxpayers? Labor union civil service will add an expensive level of bureaucracy at City Hall that would cost us millions of dollars over the next decade. That could mean higher taxes just to maintain our most basic city services.

For our families, it could mean fewer firefighters and longer response times that will put every neighborhood at great risk. It also may require cuts in other city departments, possibly with a reduction in street repairs and police patrols.

We know the firefighters of our award-winning fire department are the best in Texas. That's why the City Council recently voted to give our brave first responders a pay raise. And that's why we are not going to stand by and let labor union leaders from outside of Arlington take over our fire department. We believe our firefighters deserve better than labor union control.

Arlington voters have wisely defeated two previous labor union civil service propositions in the past. On May 6, please join us in voting No on Proposition 2. Let's send a third, and hopefully final, message that labor unions have no business running our fire department.

Sincerely,


**Jeff Williams**
Arlington Mayor

**Dr. Robert Cluck**
Former Arlington Mayor

**Richard Greene**
Former Arlington Mayor


**Sheri Capehart**
Arlington Councilmember

**Robert Shepard**
Arlington Councilmember


31



Political ad paid for by Safety First Arlington
PO Box 202371
Arlington, Texas 76006

PRSRT STD
US POSTAGE
PAID
Permit # 2760
Dallas, Texas



# HERE IS WHAT PROPOSITION 2 MEANS TO ARLINGTON:





"Proposition 2 doesn't help our firefighters who I believe are the best in Texas. It will only force City Hall to spend millions of your tax dollars to pay for union bureaucracy. That means the city can retain fewer firefighters resulting in longer response times that will put families, schools and businesses in every neighborhood at great risk. If you love our firefighters and appreciate their efforts to keep our families safe, please join me in protecting our firefighters by voting No on May 6. Let's keep the labor unions from destroying our fire department."

**Jeff Williams**
Arlington Mayor

## WE ARE VOTING NO ON PROPOSITION 2.

**Hon. Jeff Williams**
Arlington Mayor

**Hon. Dr. Robert Cluck**
Former Arlington Mayor

**Hon. Richard Greene**
Former Arlington Mayor

**Hon. Sheri Capehart**
Arlington Councilmember

**Hon. Robert Shepard**
Arlington Councilmember

**Hon. Kathryn Wilemon**
Arlington Councilmember

**Hon. Charlie Parker**
Arlington Councilmember

**Hon. Lana Wolff**
Arlington Councilmember

**Hon. Michael Glaspie**
Arlington Councilmember

**Hon. Victoria Farrar-Myers**
Arlington Councilmember

**Hon. John Hibbs**
Arlington ISD Trustee

32

# PROPOSITION 2 IS NOT ABOUT HELPING FIREFIGHTERS.
## IT'S ABOUT LABOR UNION CONTROL OF OUR FIRE DEPARTMENT.



### VOTE NO! HELP FIREFIGHTERS, NOT LABOR UNIONS.

Proposition 2 for labor union civil service will not increase the pay or benefits for our firefighters. Instead, it forces unions on Arlington's fire department, adds an expensive level of bureaucracy at City Hall, and will give union bosses just as much, if not more, authority as our award-winning Fire Chief.



### VOTE NO! STOP LONGER EMERGENCY RESPONSE TIMES.

Adding labor union civil service to the fire department will cost Arlington taxpayers millions of dollars over the next decade – that means the city can retain fewer firefighters resulting in longer response times that will put families, schools and businesses in every neighborhood at great risk.



### VOTE NO! STOP CUTS IN BASIC CITY SERVICES.

The added costs of labor union civil service in our fire department may require cuts in other city departments, possibly with a reduction in street repairs or police officers patrolling our neighborhoods. Or, it could mean higher taxes on Arlington families just to maintain our most basic city services.



### VOTE NO! LET'S RETAIN OUR BEST FIREFIGHTERS.

Proposition 2 provides for permanent employment for every Arlington firefighter. That means it would be almost impossible to remove firefighters who don't meet Arlington's high standards, and that will ultimately endanger the lives of families in all parts of Arlington.

One city councilmember, who did not attach her name to the mailers, testified at her deposition that the numbers the City had prepared to establish the cost of implementing the civil-service system appeared inflated. Several of the types of discretionary pay that were eventually cut are listed in the quoted testimony as a means of offsetting the cost of implementing the civil-service system and are part of the calculation that the councilmember viewed as inflated:

> Q. Do you recall what [the City's director of human resources] presented to the council in relation to this cost of civil[-]service issue?
>
> A. I don't recall on this date specifically, but I do recall conversations regarding this topic, yeah.
>
> Q. And, in general, can you describe what those conversations were about?
>
> A. Yes. So some of the councilmembers had questions as to how we got to this number of $807,100, so we challenged. Does it really need to cost that much? Will it cost less or will it cost more? And eventually the number changed.
>
> Q. And just so the record is clear, when we were talking about cost of civil service, is that the cost to implement civil service?
>
> A. Yes.
>
> Q. Okay. And under this $807,100 number, there are several smaller bullet points such as EMT-I, holiday pay, education incentive, sick[-]leave sellback, FLSA, and swing pay. Do you recall what those represented, what those items represent?
>
> A. Yes. These are different special pay benefits and the cost associated with each one, and that was presented as an option for the cost recovery of the $807,000.

Q. Okay. So am I correct to say that there was a cost to implement civil service and [that] these items were potentially proposed to offset that cost?

A. Yes, correct.

Q. Okay. And I think you mentioned that the number changed at some point. Do you recall how that number changed?

A. Yes. It decreased so . . .

Q. Okay. Do you recall how that number decreased?

A. I'm sorry. What are you asking specifically?

Q. Sorry. Let me rephrase that. We'll come back to this.

Do you know if this -- strike that.

When that number decreased, do you recall if the city manager gave a presentation explaining -- explaining why that number decreased?

A. Yes, yes, he did give presentations. We had -- over the course of many meetings, I don't remember the dates, I challenged this number because it seemed really, really high, and it didn't make sense. The numbers he was providing, again, seemed really, really high. So after going back and forth many times, the number decreased to what we landed on at 580,749, something like that.

Q. Okay. And that number, 500 -- that 580,000 approximate number, was that -- were there offsets that ended up covering that cost?

A. Yes.

The councilmember—who had written the blog post critical of the firefighters' efforts to obtain civil-service treatment quoted above—published another blog post after the meeting described in the testimony outlined in the preceding paragraph. The post cited the initial cost estimate of $807,000 for the implementation of civil service

35

and stated that the offsets to cover this amount would come from the pockets of the firefighters. Part of the cost savings was in the form of discretionary pay for EMT-I pay, swing pay, and education pay. The post concluded as follows:

> Lastly, we told the firefighters that benefits would be cut[] and that they would not be able to enjoy the benefits that were given to them at the City level when seeking protection at the State level. This is the truth of that statement. The only individual that stated, "[Y]our benefits won't be touched[,]" was the Union President. Now that same Union President has already threatened to sue us over two items. The first is the advent of the [d]eputy [c]hiefs becoming salaried employees[,] and the second is the [a]pparatus [o]perator list. Bring it! Litigation is very expensive[,] and we knew that the Union would try to sue the City at every opportunity. That is why we have held the $807,000 from benefits and the $500,000 for the fire truck in abeyance. The fire union has asked the citizens for civil service[,] and the citizens have given it to them. It is now time for the Council to implement the wishes of the voters.

Again, we are dealing solely with the question of whether Appellants offered more than a scintilla of evidence that retaliatory animus motivated the City's actions in cutting discretionary pay. Appellants did. One city councilmember described the attempt to obtain civil-service treatment as a slap in the council's face and stated that the loss of several items of discretionary pay (which was eventually eliminated) would be a consequence of that action. Other city councilmembers and the mayor attached their names to mailers that categorized the effort to pass the civil-service proposition as an effort to take money from taxpayers to pay for labor-union benefits and that were highly critical of the motive at play for the proposition. Then, once the proposition passed, a city councilmember, who apparently did not add her name to the mailers that

36

were critical of the proposition, stated that the numbers offered to justify the cut to discretionary pay did not make sense and seemed inflated.

The overtly critical statements made by city councilmembers in combination with the opposite conclusion by one councilmember—who apparently did not share the same critical view (i.e., the City was inflating the costs of implementation)—form more than a scintilla of evidence that the City's employment action to cut certain types of discretionary pay presents a fact question regarding whether the action was motivated by a retaliatory animus and prompts us to reverse the trial court's grant of summary judgment on this question.[9]

We also conclude that there is more than a scintilla of evidence that the City acted with retaliatory animus when it cancelled the then-existing promotional list shortly before the deadline to implement a civil-service system for firefighters.

The Local Government Code provides a 30-day deadline to implement Chapter 143 of the Local Government Code, which governs civil service: "Within 30 days after the date the municipality's first full fiscal year begins after the date of the adoption election, the governing body of the municipality shall implement this chapter." Tex.

---

[9]The City also argues that summary judgment was proper because there is no evidence of a retaliatory animus toward an individual firefighter. But this argument ignores the question of the Association's associational standing, which is a question that we do not reach. Until the associational standing question is reached, it is premature to deal with what showing of animus directed toward an individual is required. At this point, as we have noted, there is evidence of animus directed at least at the Association's efforts to obtain civil-service treatment.

Loc. Gov't Code Ann. § 143.006(a). The City's fiscal year began on October 1; thus, the Local Government Code required that the civil-service system be implemented by October 31, 2017.

Supplementing the detail that we have already provided, the Civil Service Commission created to implement the civil-service system met on October 3 and approved promotions made between November 2016 and October 2017, a current hiring list, and hires made between November 2016 and October 2017. The commission, however, declared the existing promotion lists for lieutenant, captain, and apparatus operator to be null and void. At a meeting occurring approximately two weeks after this act, the Civil Service Commission adopted detailed local rules to comply with the provisions of Chapter 143.

Before the implementation of the civil-service system, the promotion scheme of the City was governed by a standard operating procedure (SOP) manual. The SOP manual set out the promotion scheme and provided for the creation of a promotion-eligibility list that "typically last[ed] one year." A communication from the fire chief reiterated the time period that the promotion-eligibility list was in effect under the policy and that "[t]he 'effective promotional list' is the promotional list in effect during the next full pay period after a vacancy is created."

Before the action of the Civil Service Commission's voiding the then-existing promotion lists for captain, lieutenant, and apparatus operator, there was a promotion list for apparatus operators that was to be in effect from November 22, 2016, to

November 21, 2017, and from which several promotions were made, including promotions that were made after the City's voters passed the civil-service proposition for firefighters. The City also conducted promotional exams for captain and lieutenant, and a promotion list was created to be effective from July 1, 2017, to June 30, 2018. Before the Civil Service Commission nullified the existing promotion lists, the assistant fire chief sent out a memo indicating—in admittedly nebulous terms—that the City would work to promote under the then-existing promotional scheme. His memo stated,

> We will promote as soon as we have determined the best course of action to reduce any risk to the organization and also follow through on promoting members that have worked hard to make a current list or to compete in the near future.
>
> In other words, some promotions may be delayed outside of our regular practice in order to accomplish risk management needs. It is our intention, however, to utilize any existing list until October 30th, at the very least. I'm working hard this week to make a final determination with Command Staff, Human Resources[,] and the City Attorney's Offices.

Several of the individual Appellants averred that they were eligible for promotion under the prior promotional scheme but that their promotions did not occur or were delayed as a result of the new promotional scheme. Throne testified that he was on the then-existing promotional list for captain and that a vacancy for that rank became available in September 2017. Montague testified that he was on the existing promotional list for lieutenant and that a vacancy for that rank became available on September 17, 2017. Markham testified that he was on the existing promotional list for

39

apparatus operator and that a vacancy for that rank became available on September 29, 2017. Markham further testified that he was given the job title of out-of-class apparatus operator; a vacancy for that rank became available on September 16, 2017; and he was subsequently removed from that rank. Rojas testified he occupied a vacancy for apparatus operator but was subsequently removed from that position.

Thus, the record contains more than a scintilla of evidence raising a fact issue that the City was sending conflicting signals about whether it would promote using the promotional lists that existed before the Civil Service Commission's nullification of those lists on October 3.

In its brief, the City offers no rationale for its about-face on promoting from the then-existing lists but claims, instead, that it was required to alter the promotion scheme to meet the requirements of the Local Government Code. But buried within that argument is the tacit admission that the requirements of the Local Government Code did not mandate the abrogation of the then-existing lists:

> Appellants contend that [the City] misrepresented that it was required to nullify the existing eligibility lists. Contrary to Appellants' contention, Section 143.021(c) prohibits [the City] from promoting firefighters from eligibility lists that do not comply with the [c]ivil[-s]ervice examination requirements. TEX. LOC. GOV'T CODE [ANN.] § 143.021(c). October 1, 2017 marked the beginning of [the City's] fiscal year and, thus, left [the City] with just thirty days to fully implement [c]ivil [s]ervice. [*Id.*] § 143.006(a). The nullification of the pre-[c]ivil[-s]ervice promotional lists was required, and *nothing in the [c]ivil[-s]ervice statute prohibited the City from doing so in advance of the October 30, 2017 deadline.* [*Id.*] § 143.001 *et seq.* As a result, [the City's] final representation that it was required to nullify the promotional lists during the implementation period (October 3, 2017) is true as a matter of law. [Emphasis added.] [Briefing reference and footnote omitted.]

40

Appellants highlight the subtle but telling admission in their reply: "Once again, the [City has] conflated 'required to' with 'not prohibited from.' The Appellants' claim is not merely that the list was nullified[] but that it was intentionally nullified *early*, preventing multiple promotions from being completed pursuant to the then-existing promotional policy." As we have noted, questions of motivation and intent are inherently fact based. Here, the City claims that it was compelled to alter the promotional scheme when it appears that no such compulsion existed. The City sidesteps the question of why it suggested that it would promote in accordance with the then-existing scheme and then decided to do otherwise. In this circumstance, we conclude that a fact question exists regarding whether the City was motivated by a retaliatory animus in deciding to cancel the then-existing promotional lists when it did.

> **b.** **We reject the City's contention that the evidence of retaliatory animus fails because Appellants rely on the isolated blog posts and mailers.**

We also do not accept the City's argument that the councilmembers' isolated blog posts and mailers were insufficient to state a claim raised under the Texas Constitution based on political retaliation. As with many of the arguments raised in this appeal, the argument is relatively briefly addressed even though it drops us into a maze of complex principles of constitutional law with little help from the parties on how we should find our way out.

The City argues that "it is well-established law that 'isolated comment[s] of a single legislator . . . [are] insufficient to [. . .] state a First Amendment claim based on political retaliation.'" The short quote that is the basis of the City's argument is taken from a federal district court opinion from Maryland. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 440 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012). *Kensington* relied on an opinion from the United States Supreme Court holding that statements by three legislators did not show an unconstitutional motive for the scores of other legislators also making the decision. *Id.* (citing *United States v. O'Brien*, 391 U.S. 367, 384, 88 S. Ct. 1673, 1683 (1968)).

On a simple factual basis, we are dealing with a situation distinct from that referenced in *O'Brien*. Here, eight members of the City Council had expressed their views in opposition to a vote to create civil-service treatment for the firefighters. And beyond this distinction, the law is not as categorical as the City's brief portrays it to be. For example, the First Circuit has declined to adopt a bright-line rule that there must be an explicit statement from a majority of a legislative body expressing animus. *See Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom. Bogan v. Scott-Harris*, 523 U.S. 44, 118 S. Ct. 966 (1998). A summary of the First Circuit's position is as follows:

> Observing that the "precedent in this area is uncertain, and persuasive arguments can be made on both sides," the First Circuit noted that there is "a certain incongruity in allowing fewer than a majority of the council members to subject the city to liability under [S]ection 1983," yet "because discriminatory animus is insidious and a clever pretext can be hard to

42

unmask, the law sometimes constructs procedural devices to ease a victim's burden of proof." [*Scott-Harris*, 134 F.3d at 438]. The First Circuit therefore "eschew[ed] . . . a bright-line rule" and instead stated that "in a sufficiently compelling case[,] the requirement that the plaintiff prove bad motive on the part of a majority of the members of the legislative body might be relaxed and a proxy accepted instead. Nevertheless, any such relaxation would be contingent on the plaintiff['s] mustering evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others." [*Id.*]; *Collins v. Nuzzo*, 244 F.3d 246, 251 (1st Cir. 2001). In sum, the First Circuit said that the "key is likelihood: Has the plaintiff proffered evidence, direct or circumstantial, which, when reasonable inferences are drawn in her favor, makes it appear more probable (i.e., more likely than not) that discrimination was the real reason underlying the enactment of the ordinance or the adoption of the policy?" [*Scott-Harris*, 134 F.3d at 438].

*Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 75 (D. Me. 2010). Thus, the law appears to provide more leeway to prove animus than the snippet quoted from *Kensington* would indicate.

Further, the demarcation underlying the rule that *Kensington* relied on was the principle stated in *O'Brien*: Courts will not strike down a constitutional statute on the basis of an alleged illicit legislative motive. *Kensington*, 788 F. Supp. 2d at 437–38 (citing *O'Brien*, 391 U.S. at 383, 88 S. Ct. at 1682). But as federal courts have noted, even *O'Brien*'s general principle has its limits, and several of those limits appear to apply to the facts before us. Specifically,

> *In re Hubbard* . . . suggested that the outcome may have been different had the statute explicitly singled out a specific group. [*Ala. Educ. Ass'n v. Bentley (In re Hubbard)*, 803 F.3d 1298,] 1313–14 [(11th Cir. 2015)] (discussing *Ga. Ass'n of Educators v. Gwinnett Cty. Sch. Dist.*, 856 F.2d 142 (11th Cir. 1988)). The *O'Brien* rule applied because the law was facially constitutional. *Id.* at 1314. The Eleventh Circuit also noted that the *O'Brien* Court itself acknowledged that inquiry into legislative motive is permissible in certain classes of cases outside the free-speech context[] and thus limited its holding in *In re Hubbard* to "a free-speech retaliation challenge to an

otherwise constitutional statute." *Id.* at 1312 n.14 (citing *O'Brien*, 391 U.S. at 383 n.30, 88 S. Ct. [at 1682 n.30]). The *O'Brien* rule also seems to be limited to legislative acts, as the Eleventh Circuit *requires* inquiry into the subjective motivations of the members of a political body (such as a town council) when the retaliatory conduct is a course of action that is not "legislation." *See, e.g.*, *Campbell* [*v. Rainbow City, Ala.*], 434 F.3d [1306,] 1313 [(11th Cir. 2006)] (holding that First Amendment retaliation claim based on City Council and Planning Commission's denial of tentative approval for Plaintiffs' proposed building project required "evidence showing that a majority of the members of the final policymaker, the Planning Commission, acted with an unconstitutional motive").

*O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1374 (S.D. Fla. 2016) (footnotes omitted).

Here, Appellants claim that the City specifically targeted them. Further, the City's actions with respect to the promotional lists were not legislative in nature. Thus, the snippet that the City cites from *Kensington* does not provide the impenetrable defense to Appellants' retaliation claim that the City claims it does.

### c. We reject the City's argument that there is not adequate temporal proximity between the passage of the civil-service proposition and the City's acts.

Appellants argue that another factor supporting their argument—that the City had a retaliatory motive—is the temporal proximity between the passage of the civil-service proposition, the City's allegedly pretextual budget figures, Appellants' refusal to waive certain rights, and the City's cancellation of the then-existing promotional lists. The City argues that there is a six-month gap between Appellants' exercise of their rights and the City's complained-of actions. According to the City, this temporal gap breaks the chain of causation. The argument's premise—that there is a per se rule that

44

a six-month gap automatically breaks the chain of causation—is not even supported by

the case that the City relies on.

In support of its argument, the City cites *Texas Department of Aging & Disability*

*Services v. Comer*, No. 04-17-00224-CV, 2018 WL 521627, at \*4 (Tex. App.—San

Antonio Jan. 24, 2018, no pet.) (mem. op.).  The City quotes *Comer* for the language that

"a six[-]month gap between the two events is no evidence of causality."   The full

sentence from *Comer* with the language that the City quoted contains considerably more

nuance than that portrayed by the City's abbreviated quote:   "Those events were

separated by about six months, *and without other evidence*, a six-month gap between the

two events is no evidence of causality."  *Id.* at \*8 (emphasis added).

Indeed, *Comer* has a detailed discussion of causation and how the question of

temporal proximity influences the question of causation:

> "In an action arising under [Texas Labor Code Section 21.055], the
> plaintiff must first make a prima facie showing that[] (1) he engaged in a
> protected activity, (2) an adverse employment action occurred, and (3) a
> causal link existed between the protected activity and the adverse action."
> *Dias v. Goodman Mfg. Co., L.P.*, 214 S.W.3d 672, 676 (Tex. App.—Houston
> [14th Dist.] 2007, pet. denied) (citing *Pineda v. United Parcel Serv., Inc.*, 360
> F.3d 483, 487 (5th Cir. 2004)); *accord San Antonio Water Sys. v. Nicholas*, 461
> S.W.3d 131, 137 (Tex. 2015).
>
>> Evidence sufficient to establish a causal link between an
>> adverse employment decision and a protected activity may
>> include:  "(1) the employer's failure to follow its usual policy
>> and procedures in carrying out the challenged employment
>> actions; (2) discriminatory treatment in comparison to similarly
>> situated employees; (3) knowledge of the discrimination charge
>> or suit by those making the adverse employment decision; (4)
>> evidence that the stated reason for the adverse employment

decision was false; and (5) the temporal proximity between the employee's conduct and discharge."

> *Donaldson*[ *v. Tex. Dep't of Aging & Disability Servs.*], 495 S.W.3d [421,] 444 [(Tex. App.—Houston [1st Dist.] 2016, pet. denied)]. *Without other evidence to establish a causal link, the temporal proximity between the protected activity and the adverse action becomes especially important; courts have determined that, without other evidence, periods of six, five, four, and even three months between the activity and the adverse action are too long to support a causal link. See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273[–74, 121 S. Ct. 1508, 1511] (2001) (reciting periods of three and four months as too long—without other evidence of causality); *Donaldson*, 495 S.W.3d at 444 (reciting periods of five and six months as too long).

*Id.* (emphasis added).

Though not phrased in terms of "other evidence" (the phrase that *Comer* used), Appellants argue that there is a sufficient temporal proximity and cite to what may be considered other evidence:

> The temporal proximity most compelling in this case is the mere 13 days between the final refusal to give up its hard-won [c]ivil [s]ervice rights and the [City's] sweeping program of retaliation.
>
> Specifically, on September 19 and 20, 2017, the [City] made a last effort to strip away the rights of [c]ivil [s]ervice from the [Association] and its members, seeking concessions related to discipline and hiring, threatening to change sick[-] and annual[-]leave policies should the [Association] refuse. When the [Association] refused to waive the rights it had been afforded by the citizens of Arlington, the City took only 13 days to nullify all existing promotional lists, then shortly thereafter slashed specialty pays, and made good on its promises to cut sick and vacation leave. This temporal proximity to the events of September 19 and 20, 2017, serves as yet more evidence of retaliatory motive. [Record references omitted.]

Obviously, Appellants are trying to shrink the temporal gap by ignoring the period between the passage of the civil-service proposition and the City's actions. We are not

persuaded that the gap emphasized by the City is irrelevant but instead agree that the evidence cited by Appellants raises a fact question. In our view, the events are tied together by a common theme that constitutes other evidence of causation. It is not disputed that the City changed the compensation, promotional, and leave structure to address the implementation of civil service. Whether the City did this to retaliate or as part of the process necessary to implement a civil-service system is a question best resolved in the context of the element of whether the City was actually motivated to make the changes to promote efficiency. But on the question of causation, the City itself acknowledges that the actions it took were tied to Appellants' exercise of their rights to obtain civil-service treatment. Thus, we conclude that there is a fact question on the issue of causation.

### d. Appellants cannot recover damages for a constitutional tort.

The City challenged Appellants' prayer requesting an award of back pay and benefits "to [Appellants] and [to] those promoted pursuant to this lawsuit." The City's motion for partial summary judgment challenged whether the trial court had jurisdiction to award damages for a constitutional tort. Appellants do not challenge this ground in their opening brief. After the City's brief highlighted this failure, Appellants' reply brief still failed to challenge the City's contention. We conclude that the authority cited by the City establishes that Appellants, to the extent that they have predicated a damage claim on a constitutional tort, do not have a viable claim for monetary damages.

The San Antonio Court of Appeals recently outlined the authority and principles that bar a damage recovery for a constitutional tort predicated on a violation of the Texas Constitution and emphasized that this rule cannot be avoided by the subterfuge of seeking an injunction ordering the payment of back pay. *See Webb Cty. v. Romo*, 613 S.W.3d 633, 636–37 (Tex. App.—San Antonio 2020, no pet.). Specifically, the San Antonio court observed that

> [t]he Texas Constitution creates a private cause of action for monetary damages only if the specific provision at issue clearly permits it. *Brown v. De La Cruz*, 156 S.W.3d 560, 563 (Tex. 2004) (citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148–49 (Tex. 1995)). For instance, the takings provision implies a private cause of action for damages by prohibiting takings "without adequate compensation." *Id.* (citing Tex. Const. art. I, § 17). The free[-]speech and free[-]association provisions, however, only permit a private cause of action for equitable relief. *Id.* (citing Tex. Const. art. I, §§ 8, 27, 29; *Bouillion*, 896 S.W.2d at 148–49). Therefore, to the extent [the employee] seeks monetary damages for the County's alleged violation of his free[-]speech and association rights, his claims are barred by sovereign immunity. *See id.*
>
> But unlike monetary damages, reinstatement of employment is an equitable remedy generally available to a plaintiff asserting a private cause of action for violation of his constitutional free[-]speech and assembly rights. *City of Fort Worth v. Jacobs*, 382 S.W.3d 597, 599 (Tex. App.—Fort Worth 2012, pet. dism'd); *City of Seagoville v. Lytle*, 227 S.W.3d 401, 412 (Tex. App.—Dallas 2007, no pet.); *Garcia v. Corpus Christi Civil Serv. Bd.*, No. 13-07-00585-CV, 2009 WL 2058892, at *2–3 (Tex. App.—Corpus Christi[–Edinburg] July 16, 2009, no pet.) (mem. op.). "[T]he State has no power to commit acts contrary to the guarantees found in the Bill of Rights. . . . Thus, these constitutional provisions authorize suits against governmental entities—that is, constitute a waiver of immunity—when such suits seek equitable relief from allegedly void, unconstitutional governmental action." *Jacobs*, 382 S.W.3d at 600 (citing *Bouillion*, 896 S.W.2d at 147–49). Therefore, although [the employee] may not seek injunctive relief in the form of a money judgment for back pay and back benefits, he may seek the equitable remedy of reinstatement to his prior

48

position and pay grade.  *See id.*; *Lytle*, 227 S.W.3d at 412 ("[T]o the extent [the employee's] request for an injunction seeks a money judgment for the unspecified, back benefits, that claim is barred by governmental immunity.").

*Id.*; *see also Ward v. Lamar Univ.*, 484 S.W.3d 440, 454 n.14 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (op. on reh'g) (stating that Texas has no equivalent to 42 U.S.C. § 1983 that permits damage suits for violations of First Amendment rights and that "there is no implied private right of action for damages arising under the free[-]speech provision of the Texas Constitution"); *City of Arlington v. Randall*, 301 S.W.3d 896, 906–07 (Tex. App.—Fort Worth 2009, pet. denied) ("Under the Texas Supreme Court's decision in *Bouillion* and its progeny, no private cause of action exists against a governmental entity for money damages relating to the governmental entity's alleged violations of constitutional rights."), *disapproved of on other grounds by Tex. Dep't of Aging & Disability Servs. v. Cannon*, 453 S.W.3d 411 (Tex. 2015).

Thus, to the extent that Appellants seek to recover damages for a constitutional tort predicated on a violation of the Texas Constitution, the trial court did not err by granting this portion of the City's motion for partial summary judgment.

We sustain part of Appellants' first issue and hold that the trial court erred by granting summary judgment on the claims that the City retaliated against the firefighters by cancelling certain types of discretionary pay previously available to the firefighters and by nullifying existing promotional lists.  But it is unclear from Appellants' petition whether they seek damages for a constitutional violation.  As noted, their prayer

contains a request for damages. However, the specific causes of action pleaded—for violations of the equal protection, freedom of speech, due course of law, and freedom of assembly clauses of the Texas Constitution and for retaliation resulting from their exercise of their rights under the freedom of speech and freedom of assembly clauses—appear to seek only injunctive relief. Other causes of action, such as their breach-of-contract claim, may be the basis for the damage claim. Thus, at this point, we cannot say that Appellants' inability to recover damages for a constitutional tort completely forecloses their suit; it only forecloses one type of relief they arguably sought.

## B. The trial court erred by granting summary judgment based on associational standing.

The City asserted what was apparently a no-evidence ground for summary judgment attacking whether the Association had standing to assert a retaliation claim:

### 2. The [Association's] Retaliation Claims Fail[] Because They Were Not Employed by the City.

> To assert a retaliation claim, a plaintiff must necessarily demonstrate that an employment relationship existed between the plaintiff and defendant. *See Noel v. Shell Oil Co.*, 261 F. Supp. 3d 752, 764–65 (S.D. Tex. 201[7]) (citing *Muhammad v. Dall*[.] [*Cty.*] *Cmty. Supervision & Corrs. Dep*[*'t*], 479 F.3d 377, 380 (5th Cir. 2007)); *see also Miles v. Lee Anderson Co.*, 339 S.W.3d 738, 742 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Here, [the City] respectfully request[s] summary judgment because there is no evidence that the [Association was] employed by the City.

On appeal, the parties' arguments morph from the ground asserted by the City into a discussion regarding whether the Association possesses associational standing. We will not reach the merits of the question regarding whether the Association holds

associational standing. The City's summary-judgment ground asserted a narrow challenge to standing but did not challenge the alternative basis of associational standing that even its briefing acknowledges may be a basis for standing.[10] Thus, at this point, there is an unassailed basis for the Association's standing, and it is premature for us to review the question of associational standing until an attack has been made.

The live petition in this matter alleges that the Association possesses associational standing, but the City's answer alleged that the Association did "not have associational standing to sue on others' behalf." The City relies on an opinion from the Dallas Court of Appeals that recognizes that an association may have standing to assert claims on behalf of its members. *See City of Dall. v. Dall. Police Ass'n*, No. 05-02-00060-CV, 2002 WL 31474171, at *3–4 (Tex. App.—Dallas Nov. 6, 2002, no pet.) (not designated for publication). But the City argues that the Association fails to meet the standards for it to exercise associational standing. However, the argument that the City makes is not the one that it made to the trial court in support of its motion for partial summary judgment. Though the City's answer challenged the Association's standing, the City's motion raised as a ground only that it had no employment relationship with the Association.

---

[10]The cases cited by the City in its summary-judgment motion did not address the question of associational standing. Both cases merely recited that one of the elements of a claim under the Texas Commission on Human Rights Act is that "an employment relationship existed between it and the plaintiff" and examined whether the defendant was an "employer" of the plaintiff. *See Noel*, 261 F. Supp. 3d at 764–65 (citing *Muhammad*, 479 F.3d at 380); *see also Miles*, 339 S.W.3d at 742.

51

The ground asserted in a motion for summary judgment delimits both the trial court's power to grant a motion for summary judgment and our review of the trial court's grant of the motion. *Kenyon v. Elephant Ins. Co.*, No. 04-18-00131-CV, 2020 WL 1540392, at *3 (Tex. App.—San Antonio Apr. 1, 2020, pet. granted) (op. on reconsideration). Additionally, we cannot read between the lines in divining the grounds of a motion for summary judgment. *Id.* at *9. A no-evidence motion for summary judgment must explicitly state which element of the nonmovant's claims lack evidentiary support and do so in a way that gives fair notice. *See* Tex. R. Civ. P. 166a(i) ("[A] party without presenting summary[-]judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial."); *Timpte Indus.*, 286 S.W.3d at 310–11 (imposing "fair notice" standard to review of substance of summary-judgment grounds). Here, the summary-judgment ground alleged by the City simply does not address the question of associational standing.

Admittedly, we may address standing sua sponte if a lack of standing implicates the trial court's subject-matter jurisdiction. But Texas law is evolving on the question of whether a standing question is actually jurisdictional or whether it simply implicates a party's right to relief. *See Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) ("discourag[ing] the use of the term *standing* to describe extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit" and stating that "'[t]he question [of] whether a plaintiff has . . . satisfied the

requisites of a particular statute . . . pertains in reality to the right of the plaintiff to relief rather than to the subject-matter jurisdiction of the court to afford it'" (quoting *Pike v. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020))). Further, the Texas Supreme Court recently concluded that an association had constitutional, jurisdictional standing when some of its members would suffer economic harm from the increased competition created by an agency rule. *Id.*

And to address the City's claim that the Association lacks standing requires us to take another uncharted journey in this appeal that seems to implicate more the question of whether the Association has shown a right to relief rather than a question of constitutional, jurisdictional standing. The City's argument focuses on whether the prosecution of the Association's claims requires the participation of individual members of the Association.[11] However, the Association asserts injunctive and declaratory claims, and a claim for injunctive relief may create associational standing even though individual association members need to participate in the suit. *See N.Y. State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 69 (N.D.N.Y. 2020) (citing *Emps. Committed for Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 433–34 (W.D.N.Y. 2005)). Also, "so long as the nature of the claim and of the relief sought does not make the individual

---

[11]The City notes that the elements required to show associational standing are as follows: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect in the lawsuit are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See City of Dall.*, 2002 WL 31474171, at *3.

participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 511, 95 S. Ct. 2197, 2212 (1975). Thus, a number of discrete questions are implicated in the question of associational standing; those questions were never presented to the trial court. In this circumstance, we will not forecast sua sponte how we might rule on questions that were never presented to the trial court and for which we are left to our own devices to resolve.

We sustain that portion of Appellants' second issue regarding the trial court's granting summary judgment on Appellants' associational standing claim as to the two retaliation claims that survived our analysis of Appellants' first issue.

## C. The trial court did not err by granting summary judgment on Appellants' declaratory-judgment claim that the City improperly nullified the then-existing promotion list.

In their third issue, Appellants contend that the trial court erred by granting summary judgment on their declaratory-judgment claim that the City improperly nullified the then-existing promotion list when the Civil Service Commission implemented a promotional scheme utilizing the criteria of Chapter 143. The City moved for summary judgment by arguing that Chapter 143 compelled it to institute the new promotional scheme. Appellants respond that Chapter 143 did not compel the City to nullify its existing promotional scheme and that promotions pending under the then-existing scheme could have been made before the date that the civil-service system had to be implemented. We question whether the trial court had jurisdiction to hear

the declaratory-judgment claim and how Appellants had a viable declaratory-judgment claim in view of the other causes of action that they asserted.[12]

Appellants describe their declaratory-judgment claim to be one in which they "sought a declaration of their rights under Texas Local Government Code § 143.036, including restoration of the improperly nullified promotional list and promotion to the vacancies that were open, in accordance with the Civil Service Act." As we understand Appellants' brief, they contend that the City's timing of the "nullification" of the then-existing list "is strong evidence that [the City's] acts were in bad faith." Appellants then contend that the Civil Service Act did not require nullification of the then-existing

---

[12]We may examine the question of jurisdiction in the context of whether sovereign or governmental immunity has been waived sua sponte. As the Austin Court of Appeals recently noted,

> Although the Texas Supreme Court has indicated that we are not required to raise sua sponte questions of governmental immunity, it has not prohibited raising such an issue that implicates subject[-]matter jurisdiction—especially where, as here, the relief sought may be improper. *See Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 751 (Tex. 2017) (noting "while a court is obliged to examine its subject-matter jurisdiction on its own in every case, we have never suggested that a court should raise immunity on its own whenever the government is sued" (quoting *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 102 (Tex. 2012) (Hecht, J., concurring))). Moreover, our precedent has interpreted *Rusk* as implying that sovereign immunity may be raised by an appellate court sua sponte. *See Tex*[.] *Dep't of Ins. v. Tex*[.] *Ass'n of Health Plans*, 598 S.W.3d 417, 424 n.2 (Tex. App.—Austin 2020, no pet.) (citing *Tex*[.] *Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 745 (Tex. App.—Austin 2014, pet. dism'd)).

*Perrin v. City of Temple*, No. 03-18-00736-CV, 2020 WL 6533659, at *6 n.4 (Tex. App.—Austin Nov. 6, 2020, no pet.) (mem. op.).

promotion list and that promoting from the then-existing list would not violate the Act. This claim fails because it is not the type of declaratory-judgment claim for which governmental immunity has been waived; Appellants did not seek to challenge an ordinance or a statute but merely sought a declaration of their rights under a statute— a claim for which immunity is not waived.[13]

Sovereign or governmental immunity prohibits suits against governmental entities without their consent and only permits suits for which immunity has been waived "in the manner indicated by that consent." *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 331

---

[13]Sovereign and governmental immunity describe the types of political entities that receive protection. As the supreme court has explained,

> Courts often use the terms sovereign immunity and governmental immunity interchangeably. However, they involve two distinct concepts. Sovereign immunity refers to the State's immunity from suit and liability. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997). In addition to protecting the State from liability, it also protects the various divisions of state government, including agencies, boards, hospitals, and universities. *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976). Governmental immunity, on the other hand, protects political subdivisions of the State, including counties, cities, and school districts. *City of LaPorte v. Barfield*, 898 S.W.2d 288, 291 (Tex. 1995); *Guillory v. Port of Hous*[.] *Auth.*, 845 S.W.2d 812, 813 (Tex. 1993); *see also* Renna Rhodes, *Principles of Governmental Immunity in Texas: The Texas Government Waives Sovereign Immunity When it Contracts—Or Does It?*, 27 St. Mary's L.J. 679, 693–96 (1996).

*Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003).

(Tex. 2006)). A waiver of immunity must be done in clear and unambiguous language. Tex. Gov't Code Ann. § 311.034; *Tooke*, 197 S.W.3d at 332–33.

The Texas Uniform Declaratory Judgments Act (UDJA) provides that "[a] person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). But this authorization is not a waiver of governmental immunity to entertain such a claim—the UDJA generally "does not enlarge the trial court's jurisdiction but is 'merely a procedural device for deciding cases already within a court's jurisdiction.'" *Hegar v. CSG Forte Payments*, No. 03-19-00325-CV, 2020 WL 7233605, at *3 (Tex. App.—Austin Dec. 9, 2020, no pet.) (mem. op.) (citing and quoting *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621–22 (Tex. 2011)).

The UDJA's waiver of immunity is limited to challenges to a statute or an ordinance's validity. *Id.* As the Austin court has explained, the UDJA does not waive immunity on the questions of statutory construction or a declaration of rights:

> As the Texas Supreme Court has clarified, the UDJA's sole feature that can affect a trial court's jurisdiction to entertain a substantive claim is the statute's implied limited waiver of sovereign immunity for claims challenging the validity of ordinances or statutes. *See Tex*[.] *Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 634–35 (Tex. 2010) (citing Tex. Civ. Prac. & Rem. Code [Ann.] § 37.006(b); *Tex*[.] *Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994)). It has squarely repudiated the once widespread notion that the UDJA confers some broader right to sue the government to obtain "statutory construction" or a "declaration of

57

rights." *See Sefzik*, 355 S.W.3d at 621–22 ("The UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law."); [*Tex. Parks & Wildlife Dep't v.*] *Sawyer Tr.*, 354 S.W.3d [384,] 388 [(Tex. 2011)] ("there is no general right to sue a state agency for a declaration of rights" in light of limited scope of UDJA's immunity waiver).

*Id.*; *see also Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 552–53 (Tex. 2019) ("[T]he UDJA does not contain a general waiver of sovereign immunity, providing only a limited waiver for challenges to the validity of an ordinance or statute. UDJA claims requesting other types of declaratory relief are barred absent a legislative waiver of immunity with respect to the underlying action." (citations omitted)); *City of San Antonio v. San Antonio Park Police Officers Ass'n*, No. 04-20-00213-CV, 2021 WL 2942531, at *5–6 (Tex. App.—San Antonio July 14, 2021, no pet. h.) (mem. op.) (holding that the UDJA does not waive immunity for a claim seeking a declaration of rights under Local Government Code Chapter 143); *Pidgeon v. Turner*, 625 S.W.3d 583, 598 (Tex. App.—Houston [14th Dist.] 2021, no pet. h.) ("Appellants, in their amended petition, request declarations to address violations of state law; none challenge a statute or [an] ordinance. Because appellants seek only to enforce existing law, this exception to governmental immunity is not available." (footnote omitted)).[14]

---

[14]Also, Appellants have challenged the City's action in changing the promotion scheme both through a mandamus and a breach-of-contract claim. Thus, it appears that the declaratory-judgment claim is redundant of those claims. Again, citing from a case from the Austin Court of Appeals,

Appellants' declaratory-judgment claim—as they describe it—is not a challenge to the validity of a statute or an ordinance. Instead, Appellants sought a declaration that they had the right to be promoted in accordance with the promotion scheme that existed before the Arlington Civil Service Commission adopted a revised promotion scheme that it viewed as being in conformity with Chapter 143. This is not a claim for which immunity has been waived.

We overrule Appellants' third issue.

---

We also are bound by the Texas Supreme Court's opinion in *Patel*[ *v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69 (Tex. 2015)]. In that case, the court explained that, under the redundant remedies doctrine, courts do not have jurisdiction over a claim brought under the UDJA against a governmental entity "when the same claim could be pursued through different channels." *See* [*id.*] at 79; *see also EMCF Partners*[*, LLC v. Travis Cty.*, No. 03-15-00820-CV], 2017 WL 672457, at \*6–7 [(Tex. App.— Austin Feb. 15, 2017, no pet.) (mem. op.)] (applying *Patel* to conclude redundant remedies doctrine stood as additional bar to UDJA claim where plaintiff did not rely on "procedural vehicles and their concomitant statutory waivers of immunity" but "instead [relied] solely on the UDJA"); *McLane Co.*[ *v. Tex. Alcoholic Beverage Comm'n*], 514 S.W.3d [871,] 877–78 [(Tex. App.—Austin 2017, pet. denied)] (concluding that trial court lacked jurisdiction to hear ultra vires claims because claims could be pursued through explicit waiver of immunity under Public Information Act); *Riley v. [Comm'ners] Court*, 413 S.W.3d 774, 777–78 (Tex. App.—Austin 2013, pet. denied) (concluding that declarations that [the Texas Open Meetings Act (TOMA)] was violated were redundant of relief available under TOMA).

*City of New Braunfels v. Carowest Land, Ltd.*, 549 S.W.3d 163, 173 (Tex. App.—Austin 2017), *vacated on other grounds by Carowest Land, Ltd. v. City of New Braunfels*, 615 S.W.3d 156 (Tex. 2020).

59

**D.** **The trial court did not err by granting summary judgment on Appellants' declaratory-judgment claim that by creating a stakeholder committee, the City violated the firefighters' rights to present grievances.**

In their fourth issue, Appellants challenge the trial court's grant of summary judgment on their declaratory-judgment claim relating to the City's creation of a stakeholder committee. Appellants challenge the City's withdrawal from meet-and-confer arrangements with the Association and the creation of a stakeholder committee, with that committee's membership selected by the fire chief. Appellants sought a declaration that this action violated the public employees' statutory rights as set forth in the Labor Code and the Government Code because "[i]n revoking the City's recognition of the Association as a representative, and then handpicking individuals to serve on the stakeholder committee to deliberately exclude the Association from participating, the City effectively foreclosed the ability of public employees to discuss their grievances regarding working conditions through representatives of their choosing." In essence, the statutory provisions that Appellants rely on protect only the ability of workers to form labor organizations and the ability of a public employee to present grievances to a person in a position of authority who is able to remedy that grievance. The record before us does not show that the withdrawal of the meet-and-confer arrangement violated either provision.

The substantive portion of Appellants' tenth cause of action that embraces the declaratory-judgment claim regarding the cancellation of the meet-and-confer

arrangement states, "By supporting the management-friendly association (the so-called 'stakeholder committee') and by dominating and interfering with the administration of the Association, the City has violated the rights of [Appellants] under Texas Labor Code Section 101.001 and Texas Government Code Section 617.005." The City moved for summary judgment on this claim in one paragraph that concluded as follows: "Therefore, because the alleged 'rights' in these statutes are not restricted to dealing only with union officials, the City has not violated the Labor Code or the Government Code by meeting with a 'stakeholder committee.'"

In their response to the City's motion, Appellants challenged the cancellation of the meet-and-confer arrangement and the creation of the stakeholder committee because (1) the fire chief did not ask the Association's board to be on the stakeholder committee; (2) the fire chief stated that the meet-and-confer arrangement had become "too confrontational, too aggressive, too disruptive" and that they "were going to restart in a -- in a fresh manner that was open and transparent"; and (3) the fire chief selected the members of the new stakeholder committee, its meetings were not public, and no formal meeting minutes were kept. Appellants challenged the new stakeholder committee that was substituted for the meet-and-confer arrangement because it had the effect of "the City['s] ceas[ing] to recognize the [Association] as the sole and exclusive bargaining agent for the Association's members." Appellants then characterized the City's actions as "an obvious attempt to interfere with the Association's rights[ and] to organize an employee organization with content and membership more to their liking."

The claimed effect of the arrangement was, as noted, that "the City effectively foreclosed the ability of public employees to discuss their grievances regarding working conditions through representatives of their choosing."

Turning to the sections of the Texas Labor and Government Codes that Appellants claimed the City violated, Appellants first invoked Section 101.001 of the Labor Code: "All persons engaged in any kind of labor may associate and form trade unions and other organizations to protect themselves in their personal labor in their respective employment." Tex. Lab. Code Ann. § 101.001. However, Appellants' claims do not fall within the ambit of Section 101.001 because the Texas Supreme Court has interpreted the language of the statute as conferring the right to form a labor union or other organization but not as creating rights that "attach" to such an organization once created. *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 137 (Tex. 2013).[15] Appellants

---

[15]The Texas Supreme Court detailed its construction of Section 101.001 as follows:

> Section 101.001, captioned "Right to Organize," provides[,] "All persons engaged in any kind of labor may associate and form trade unions and other organizations to protect themselves in their personal labor in their respective employment." Tex. Lab. Code [Ann.] § 101.001; *see also Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 809 (Tex. 2010) ("[T]he title of [a statute] carries no weight, as a heading does not limit or expand the meaning of a statute." (internal quotation marks omitted)). While the statute is broad, we do not read it as conferring, by its plain language, the specific right to have a union representative present at an investigatory interview that an employee reasonably believes might result in disciplinary action. In fact, on its face, the statute confers only one explicit right: the right to organize into a trade union or other organization. By its plain

62

do not contend that they have been deprived of the right to form the Association, which is the right protected by Section 101.001. Thus, the trial court did not err by granting summary judgment on Appellants' claim that sought a declaration that the City's actions in cancelling the meet-and-confer arrangement and creating the stakeholder committee violated Section 101.001 of the Labor Code.

Appellants also invoked Section 617.005 of the Government Code: "This chapter does not impair the right of public employees to present grievances concerning their wages, hours of employment, or conditions of work either individually or through a representative that does not claim the right to strike." Tex. Gov't Code Ann. § 617.005. The authority interpreting this statute is sparse. *See Yarbrough v. Tex. A&M Univ.–Kingsville*, 298 S.W.3d 366, 370 (Tex. App.—Corpus Christi–Edinburg 2009), *rev'd on other grounds*, 347 S.W.3d 289 (Tex. 2011). Neither party offers us any more guidance on the statute's meaning other than the Texas Supreme Court's citing to a Texas Attorney General opinion and stating that "implicit in [S]ection 617.005 'is the notion that public officials should meet with public employees or their representatives at reasonable times and places to hear their grievances concerning wages, hours of work,

---

terms, the statute makes it lawful for employees to form labor unions or other organizations, and specifically, those organizations created to protect them in their employment. It says nothing about any rights that may attach once such unions are formed.

*Id.* at 133–34.

and conditions of work.'" *City of Round Rock*, 399 S.W.3d at 135 (quoting Tex. Att'y Gen. Op. No. H-422 (1974)).

The guidance that we can find about the right created by Section 617.005 comes from the Corpus Christi–Edinburg court. *See Yarbrough*, 298 S.W.3d at 370. In *Yarbrough*, a public employee sought a declaration that Section 617.005 had been violated because her employer offered her no mechanism to present a grievance to a person who had the authority to remedy her problem. *Id.* at 370–72. Looking to its prior authority, the court held that Section 617.005 accorded an employee only the right to present a grievance to a person who had the actual, rather than apparent, authority to address the grievance:

> Accordingly, we conclude that a public employer complies with [S]ection 617.005 so long as it allows its employees to access persons in positions of authority to present their grievances. *See* [Tex. Att'y Gen. Op. No. H-422, at 2] ("Having the right to present grievances necessarily implies that someone in a position of authority is required to hear them . . . ."). However, it is not enough that the approached person have a generally authoritative title—such as associate vice president for academic affairs. Rather, the person to whom the employee grieves must have the authority to actually correct the complained-of wrong. By our decision today we do not conclude that the person to whom the grievance is presented is under any sort of legal compulsion to take action. *See id.* Neither are we mandating that, as was requested by the employees in *Padilla*, public employers hold hearings for every grievance brought before them. *See* [*Corpus Christi Indep. Sch. Dist. v.*] *Padilla*, 709 S.W.2d [700,] 707 [(Tex. App.—Corpus Christi–Edinburg 1986, no writ)] (agreeing that a requirement that the board of trustees hold an evidentiary hearing for every employee complaint would place an "overwhelming burden" on the board). We merely conclude that the person hearing the employee's grievance must have the power to remedy the complaint if it is ultimately determined that is the correct course of action. Based on the foregoing, we cannot conclude that [the university's] actions with regard to

64

[appellant]'s grievance complied with [S]ection 617.005, and thus, its actions cannot provide a basis for granting [the university's] motion for summary judgment.

*Id.* at 372–73; *see also Player v. Dall. Cty.*, No. 3:12-CV-3947-N, 2014 WL 12834581, at *4 (N.D. Tex. Feb. 19, 2014) (order) (stating that "Texas courts have interpreted [Section 617.005] 'to ensure only that public employees have access to those in a position of authority in order to air their grievances'" and that Section 617.005 "does not require that employees have the opportunity to 'present their grievances to the highest elected officials' through a formal hearing, nor does it require that the person hearing the grievance take any particular action" (citations omitted)).

Here, Appellants claim that the City's action foreclosed the presentation of grievances through the meet-and-confer mechanism but make no allegation and offer no proof that they were deprived of any mechanism to present their grievances to a person with the authority to address them. The City points out this failing by noting, "Nor is there any evidence demonstrating that firefighters were not allowed to submit grievances to [the City]." The City highlights that its Civil Service Commission has developed rules that "set forth a procedural framework for firefighters to utilize in the event they dispute suspensions, demotions and/or promotional passovers." But no matter what proof there is of the Civil Service Commission's ability to deal with grievances, Appellants simply have not raised a fact issue regarding a violation of Section 617.005 because even if one avenue of presenting grievances to the City was

foreclosed, the summary-judgment evidence does not show that Appellants lack an authorized avenue to present a grievance to a person with the authority to deal with it.

We overrule Appellants' fourth issue.

## E. The trial court did not err by granting a summary judgment on Appellants' claim for a writ of mandamus.

In their fifth issue, Appellants challenge the trial court's grant of summary judgment on their claim for a writ of mandamus. In their second cause of action, Appellants pleaded that the City's former director of human resources and civil service had violated a ministerial duty by failing to promote certain of the individual Appellants; we have described the basis of this complaint in prior portions of this opinion. Though Appellants' petition is not clear, it appears to allege that a ministerial duty existed to promote in accordance with the promotion list that existed before the abrogation of the list by the Civil Service Commission on October 3, 2017.

The City moved for summary judgment on this claim on two grounds: (1) the Director did not violate a ministerial duty, and (2) Appellants failed to establish that they lacked an adequate remedy at law. With respect to the first ground, the City asserted that

> a claim for mandamus relief lies "when there is a legal duty to perform a nondiscretionary act, a demand for performance of that act, and a refusal by the involved official." *O'Connor v. First Court of Appeals*, 837 S.W.2d 94, 97 (Tex. 1992)[ (orig. proceeding)]. But here, there is not a "legal duty to perform a non-discretionary act." *See id.* Specifically, under Tex. Loc. Gov't Code [Ann.] § 143.006, there was a 30-day window from the commencement of the fiscal year (October 1st) to complete the implementation of [c]ivil [s]ervice. In the process of preparing for the

implementation of [c]ivil [s]ervice, the Civil Service Commission nullified the then-existing promotional[-]eligibility lists because they were not created in accordance with Chapter 143. Nothing in the [c]ivil [s]ervice statute provided [the director of human resources] any authority to promote individuals from a pre-[c]ivil [s]ervice promotional[-]eligibility list. Tex. Loc. Gov't Code [Ann.] § 143.001 *et seq.* Putting aside that [the director of human resources] did not have a legal duty to perform a "non-discretionary act," [Appellants'] request effectively asks the [c]ourt to require [the director of human resources] to perform an act that violates the [c]ivil[-s]ervice statute. [*Id.*] § 143.021. The [c]ourt should not indulge [Appellants'] request to certify a promotional list that is non-compliant with Chapter 143. [Appellants'] mandamus claim fails for that reason alone.

Appellants responded to the contention that a ministerial duty existed by arguing that "the [f]ire [c]hief was under a legal obligation to perform a nondiscretionary act under SOP 101.11, the promotional policy under which he had specific mandatory obligations that flowed from [Appellants'] participating [in] the promotional process." They also argued that Section 143.036 of the Local Government Code created an obligation to promote and that the director of human resources violated this provision. These themes carry forward into Appellants' briefing where they argue that there is mandatory language in the SOP that triggered a mandatory duty.

The City responds to the arguments by reiterating that the SOP gives the City "the authority to modify, revoke, suspend, interpret, terminate, or change any or all of the polic[i]es specified in this [m]anual, or procedures published pursuant to its authority, in whole or in part at any time, with or without notice." The City's also reiterates that Appellants cannot rely on Chapter 143 as a basis to create a duty to conform to the promotion process under the SOP because that process is at odds with

67

Section 143.021's requirement that positions be filled based on an examination. *See* Tex. Loc. Gov't Code Ann. § 143.021(c) (stating that "an existing position or classification or a position or classification created in the future either by name or by increase in salary may be filled only from an eligibility list that results from an examination held in accordance with this chapter").

In their reply brief, Appellants argue that because the Civil Service Commission found that previous promotions had been made in "substantial compliance" with Chapter 143 and because the Civil Service Commission had extended the use of pre-civil-service hiring lists beyond the implementation of deadline for civil service, there was no discretion to abrogate the then-existing promotion lists because "[i]f Chapter 143 applied as of October 1, 2017, then [the City] had a legal obligation to promote from the list that it found in 'substantial compliance' with Chapter 143."

As a general principle, "[a] writ of mandamus will issue to compel a public official to perform a ministerial act." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex. 1991). "An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Id.*; *see also City of Hous. v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018) (same).

With respect to the SOP, Appellants do not dispute that the manual contains the proviso that the City references, nor do Appellants respond to the argument that the provision gave the City the authority to change the manual. In such a circumstance,

the manual did not impose a duty in such a way that it left nothing to the discretion of the public officials implementing its provisions. Appellants offer no authority to challenge this view.

Next, Appellants' one-sentence conclusion in their brief that Section 143.036 is "mandatory" gives us no guidance on how that section created a ministerial duty to promote under the then-existing list. If we can cobble together the argument from other portions of Appellants' brief, it appears to be that one section of Chapter 143 requires promoting from an existing list. *See* Tex. Loc. Gov't Code Ann. § 143.036(e) ("If an eligibility list exists on the date a vacancy occurs, the department head shall fill the vacancy by permanent appointment from the eligibility list furnished by the commission within 60 days after the date the vacancy occurs."). But that section does not dictate anything about how to use a list created outside the civil-service system. Indeed, the statute dictates who should be promoted and that the promotion should be made from a person holding the top spot on an "eligibility" list: "Unless the department head has a valid reason for not appointing the person, the department head shall appoint the eligible promotional candidate having the highest grade on the eligibility list." *Id.* § 143.036(f). As Appellants point out, Chapter 143 establishes the criteria to be used to place a firefighter on the promotion-eligibility list. *See id.* § 143.021(c) ("[A]n existing position or classification or a position or classification created in the future either by name or by increase in salary may be filled only from an eligibility list that results from an examination held in accordance with this chapter."). The eligibility list

69

is prepared on the basis of seniority and the score on a written examination. *Id.* § 143.033(c) (explaining that unless a different procedure is adopted under an alternate promotional system as provided by Section 143.035, "the grade that must be placed on the eligibility list for each . . . fire fighter shall be computed by adding the applicant's points for seniority to the applicant's grade on the written examination, but . . . only if the applicant scores a passing grade on the written examination").

Everyone agrees that the promotional list prepared in accordance with the SOP relied on different criteria than that used to create an eligibility list in accordance with the terms of Chapter 143. Thus, the statutory scheme does not address or create a duty that dictates the use of a list prepared before the implementation of the civil-service system. Appellants cite us to no case that provides guidance on this question.

The provision of the manual giving the City the authority to alter its terms and the lack of a provision of Chapter 143 mandating how to use a promotional list created outside the promotion-eligibility scheme of Chapter 143 may explain why Appellants shifted gears to the argument made in their reply brief. The argument in their reply brief is that the finding of the Civil Service Commission—that promotions between November 2016 and October 2017 had been "done in substantial compliance with Chapter 143 of the Texas Local Government Code"—undermines the City's argument that they "could not have used the pre-[c]ivil[-s]ervice promotional lists once [c]ivil [s]ervice was implemented." To a certain extent, this argument turns the question on its head. The ministerial-duty question is not whether an official could have done

70

something but whether the official had a duty established "with sufficient certainty that nothing is left to the exercise of discretion." Again, without any support in the two sources that Appellants rely on to establish that duty—the SOP and Chapter 143—the fact that the Civil Service Commission might have made a different decision on the use of the existing list begs the question of whether it had the requisite ministerial duty to use it.[16]

We overrule Appellants' fifth issue.

## F. The trial court did not err by granting summary judgment on Appellants' equal-protection claim.

In their sixth issue, Appellants claim that the trial court erred by granting summary judgment on their equal-protection claim. We conclude that the trial court did not err because that claim is simply a relabeling of Appellants' retaliation claims.

The factual allegations supporting Appellants' equal-protection claim are narrow and mimic their retaliation claims. The allegations are simply that the City, in implementing civil service, created several employment classifications. The Arlington Fire Department's Civil Service Commission's local rules created a classification titled "Management Classification" among other classifications such as "Firefighter" and "Fire Apparatus Operator." Placed within that management classification was the job title of "Fire Deputy Chief." The local rules set out various specialized qualifications

---

[16]Because of our disposition of this issue, we do not reach the City's argument that Appellants failed to establish that they had an adequate remedy at law because they failed to timely file suit. *See* Tex. R. App. P. 47.1.

required of a fire deputy chief. A candidate for fire deputy chief could be bypassed if the candidate had not been a battalion chief for two years and had not earned a bachelor's degree. Fire deputy chiefs were also required to hold various state-issued certifications not required of lower ranking classifications. Out of the Association's authorized strength of several hundred personnel, there were only nine fire deputy chief positions. The fire chief testified that the fire deputy chiefs were "under the civil[-]service rules."

Appellants predicate their equal-protection claim on one aspect of how fire deputy chiefs were treated differently than other classifications, such as those falling within the classification for fire suppression and fire prevention. Fire deputy chiefs were not made subject to the policy that was passed with the implementation of the civil-service system that restricted the accrual of vacation and sick leave. Appellants claim that "[d]eputy [c]hiefs . . . in the Fire Department are subject to Chapter 143, just like Appellants, and are similarly situated to Appellants in all material respects except for their non-membership in the Association." Thus, Appellants contend that treating fire suppression and prevention personnel differently than fire deputy chiefs is evidence of punishing the lower ranked personnel for exercising their rights to associate and speak on matters of public concern. The record references that Appellants cite, however, do not indicate that fire deputy chiefs are not members of the Association.

The equal-protection provision of the federal constitution and the Texas Constitution are similar and coextensive. *Alobaidi v. Univ. of Tex. Health Sci. Ctr. at Hous.*,

243 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).[17] Thus, we apply the approaches used to analyze federal equal-protection claims to Appellants' claims based on the Texas Constitution. *Id.*

The trial court did not err by granting summary judgment on Appellants' equal-protection claim because it appears to be an effort to re-label what is at bottom a retaliation claim. Indeed, Appellants themselves claim that their equal-protection claim is predicated on the fact that "the record is rife with evidence of the City's retaliatory and unlawful motive: to punish the Association for exercising the fundamental right to speak out on matters of public concern." Thus, Appellants are asserting that their free-speech rights—rather than their rights to equal protection—were violated.

The Fourth Circuit recently dealt with an attempt to repackage a retaliation claim as an equal-protection claim and rejected the attempt:

> Neither our [c]ourt nor the Supreme Court has recognized an equal protection right to be free from retaliation. To the contrary, we have previously held that "'[a] pure or generic retaliation claim . . . simply does

---

[17]As *Alobaidi* explained,

The federal constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Similarly our state constitution provides: "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." Tex. Const. art. I, § 3. The federal analytical approach applies to equal[-]protection challenges under the Texas Constitution. *Bell v. Low Income Women*, 95 S.W.3d 253, 266 (Tex. 2002).

*Id.*

73

not implicate the Equal Protection Clause.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999) (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997)). Instead, we have consistently considered retaliation claims brought under Section 1983 to be more properly characterized as claims asserting a violation of the First Amendment. *See Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017); *Kirby v. Elizabeth City*, 388 F.3d 440, 447 (4th Cir. 2004)[ (op. on reh'g)]; *Edwards*, 178 F.3d at 250. As we have explained, allegations that an employer subjected an employee to adverse consequences "in retaliation for his speech are, at their core, free-speech retaliation claims that do 'not implicate the Equal Protection Clause.'" *Kirby*, 388 F.3d at 447 (quoting *Edwards*, 178 F.3d at 250). When an employee experiences an adverse employment action after "voic[ing] a grievance" to her public employer, "[a] violation of the First Amendment's protection of the right to speak out is a necessary predicate to a claim of pure retaliation." *Beardsley* [*v. Webb*], 30 F.3d [524,] 530 [(4th Cir. 1994)]; *cf. Martin*, 858 F.3d at 252 (affirming dismissal of equal[-]protection claim because prisoner's claim of retaliation for filing grievance and participating in grievance resolution process was "best characterized as a mere rewording of his First Amendment retaliation claim").

*Wilcox v. Lyons*, 970 F.3d 452, 458–59 (4th Cir. 2020) (footnote omitted), *cert. denied*, No. 20-939, 2021 WL 2405161 (2021).

The principle that a party may not successfully recast a retaliation claim into an equal-protection claim is not isolated to the Fourth Circuit. *Wilcox* noted the almost universal acceptance of the principle by other courts, including the Fifth Circuit; *Wilcox* inventoried the cases from other circuits rejecting the attempt to recast a retaliation claim as follows:

In reaching this conclusion, we join the vast majority of circuit courts to have considered the question. At least six of our sister circuits have held that the Equal Protection Clause cannot sustain a pure claim of retaliation. *See Thomas v. Indep. Twp.*, 463 F.3d 285, 298 n.6 (3d Cir. 2006) (retaliation for complaint of race discrimination); *Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir. 1990) (retaliation for complaints about improper

74

promotions and misconduct by other police officers); *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 439–[]40 (6th Cir. 2005) (retaliation for complaint of police harassment); *Boyd* [*v. Ill. State Police*], 384 F.3d [888,] 898 [(7th Cir. 2004)] (retaliation for filing charges of race discrimination); *Yatvin* [*v. Madison Metro. Sch. Dist.*], 840 F.2d [412,] 418 [(7th Cir. 1988)] (retaliation for filing charges of sex discrimination); *Maldonado v. City of Altus*, 433 F.3d 1294, 1308 (10th Cir. 2006) (retaliation for complaint of national origin discrimination)[, *rev'd on other grounds by Bristow Endeavor Health Care, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515 (10th Cir. 2017)]; *Teigen v. Renfrow*, 511 F.3d 1072, 1084–[]86 (10th Cir. 2007) (retaliation for complaints about violations of state employment laws); *Watkins*, 105 F.3d at 1354 (retaliation for complaints of sexual and racial harassment); *see also Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1237 (8th Cir. 2013) (observing that other courts have rejected equal[-]protection retaliation claims and concluding that "no clearly established right exists under the *equal*[-]*protection* clause to be free from retaliation" (internal quotation marks omitted)). And a host of district courts—both within our circuit and beyond (including in circuits that have not yet resolved this question)—have reached the same conclusion.

*Id.* at 461–62 (footnote omitted).

At the core of Appellants' equal-protection claim is a claim of retaliation. Appellants' theory of their case and their argument on appeal is that the City retaliated against them because they exercised their First Amendment right to speak and to convince the voters to accord them civil-service treatment. We have analyzed Appellants' claim in that context and concluded that the present state of the record is such that the trial court should not have granted summary judgment on a portion of their retaliation claims. But Appellants' equal-protection claim differs from their retaliation claim only in the label that they placed on it. Based on the precedent we cite, that effort fails.

We overrule Appellants' sixth issue.

75

**G.    The trial court did not err by granting summary judgment on Appellants' free-speech and free-assembly claims.**

In their seventh issue, Appellants challenge the trial court's grant of summary judgment on their free-speech and free-assembly claims. Appellants pleaded causes of action that the City and its Civil Service Commission violated their rights to free speech and to freely assemble in various ways when it implemented the civil-service system, such as cancelling the then-existing promotion list, eliminating "meet and confer," restructuring pay and leave, and transferring personnel. The relief sought as a remedy to these claims was a declaration that the actions "were unconstitutional" and that the City be enjoined from taking such actions. Appellants do not allege that the actions were ultra vires or that the ordinance and resolutions were unconstitutional. As we explain below, the claims alleged are barred by governmental immunity.

Certainly, governmental "immunity is inapplicable when a suit challenges the constitutionality of a statute and seeks only equitable relief." *Patel*, 469 S.W.3d at 75–76. But the allegations here are not that the ordinances or other actions are unconstitutional; they are that the City and the Civil Service Commission acted in a way that injured Appellants' constitutional rights in how they implemented the civil-service system. In other words, the City and the Civil Service Commission should have taken a different course in implementing the civil-service system. The principles of governmental immunity prevent courts from exercising such a tight rein on

76

governmental discretion; Appellants are, in essence, asserting an unpleaded and invalid ultra vires claim.

*Patel* explained the difference between a valid claim to enjoin enforcement of an unconstitutional statute and an ultra vires claim. The distinction in *Patel* was that the plaintiffs "challenged the constitutionality of the cosmetology statutes and regulations on which the officials based their actions." *Id.* at 76. A governmental official's action in implementing a statute may be challenged but only if the official acted outside of the realm of his discretion. In *Patel*, citing its prior opinions in *City of El Paso v. Heinrich* and *Texas Department of Insurance v. Reconveyance Services, Inc.*, the Texas Supreme Court noted that

> [i]n *Heinrich*[,] we decided that sovereign immunity does not prohibit suits brought to require state officials to comply with statutory or constitutional provisions. 284 S.W.3d [366,] 372 [(Tex. 2009)]. But, to fall within this "ultra vires exception," a suit must allege that a state official acted without legal authority or failed to perform a purely ministerial act, rather than attack the officer's exercise of discretion. *Id.* The governmental entities themselves remain immune from suit, though, because unlawful acts of officials are not acts of the State. *Id.* at 372–73. Thus, we concluded that suits complaining of ultra vires actions may not be brought against a governmental unit[] but must be brought against the allegedly responsible government actor in his official capacity. *Id.* at 373.

> We reconfirmed the point in *Reconveyance*[] where we held that the trial court lacked jurisdiction to hear a suit against the Texas Department of Insurance. 306 S.W.3d [256,] 258–59 [(Tex. 2010)]. We concluded that the claims were substantively ultra vires claims because the pleadings alleged [that] the Department of Insurance had acted beyond its statutory authority. *Id.* That being so, the claims should have been brought against the appropriate state officials in their official capacities. *Id.*

*Id.* at 76. Thus, as we read *Patel*, the demarcation is that governmental immunity does not bar a suit to enjoin the enforcement of an unconstitutional statute, but the claim that a government official improperly implemented a statute must be predicated on an ultra vires claim.

Here, Appellants do not identify a statute or even an ordinance that they contend is unconstitutional. Instead, they argue that the actions of the City and the Civil Service Commission adversely impacted their rights in the implementation of civil service. Certainly they challenge the motive behind many of the actions, but that does not mean that the City and the Civil Service Commission (if they were the proper parties for an ultra vires claim) lacked the legal authority to do as they did or had a ministerial duty to implement civil service in the fashion that Appellants advocate. The claim that comes closest to falling in the category of an ultra vires claim is that of the failure to follow the existing promotion list, but as we explained, we reject the contention that the Civil Service Commission had a ministerial duty to promote from the then-existing list. Other decisions about staffing and pay were not ones about which the City, the commission, or individual officials had no discretion. To the contrary, Appellants' claims argue that the manner by which that discretion was exercised is evidence of a retaliatory motive. *See City of Lubbock v. Adams*, 149 S.W.3d 820, 827 (Tex. App.— Amarillo 2004, pet. denied) (stating that when Chapter 143 does not mandate the method of calculating pay, a decision based on the City method of calculating pay is not subject to judicial review).

Further, neither Appellants' petition, their response to the City's motions for partial summary judgment, nor their opening brief mentions an ultra vires claim. The words are not even used until Appellants' reply brief, which includes a footnote stating that "[the City's] contention that *ultra vires* claims are waived by omission from pleadings is incorrect." The footnote cites to the Texas Supreme Court's opinion in *Reconveyance* where Reconveyance sued a governmental entity seeking a declaration. 306 S.W.3d at 257–59. The Texas Supreme Court held that such a claim constituted an ultra vires claim, which could not be made against a governmental entity, and dismissed the suit. *Id.* If Appellants are arguing that we should rely on *Reconveyance* to read an unpleaded and unmentioned ultra vires claim into the suit, that opinion is of no help to them.

We overrule Appellants' seventh issue.

## H. The trial court did not err by granting summary judgment on Appellants' due-course-of-law claim.

In their eighth issue, Appellants challenge the trial court's grant of summary judgment on their due-course-of-law claim. Appellants contend that the City deprived them of due course of law by failing to promote those who were on the promotion-eligibility list at the time that the Civil Service Commission altered the promotion scheme. As with many of Appellants' arguments, this argument is predicated on the argument that the SOP establishing the pre-civil-service promotion regime or Chapter 143 created an expectation that those on the list would be promoted under the existing

scheme.[18] Appellants' arguments have evolved on appeal to focus on whether those on the promotion-eligibility list had a property interest necessary to support a due-course claim. We hold that they did not.

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. The provision protects substantive and procedural rights. *Su Inn Ho v. Univ. of Tex. at Arlington*, 984 S.W.2d 672, 683–84 (Tex. App.—Amarillo 1998, pet. denied). In evaluating a due-course claim, "we must determine whether [the employee] has a liberty or property interest that is entitled to procedural due process protection, and if she does, what process is due." *In re G.C.*, 66 S.W.3d 517, 525 (Tex. App.—Fort Worth 2002, no pet.).

---

[18]Appellants' argument with respect to their due-process claim is as follows:

> Under either SOP 101.11, which sets out the procedures that the [Fire] Department agreed to follow for promotional candidates, or Chapter 143, Appellants had a clear expectation that their promotions would be handled fairly and in the agreed-upon manner. Instead, [the City] acted arbitrarily and capriciously in nullifying the lists on October 3, 2017, when it is clear that there was no legal requirement that [it] do so on that date, or even prior to October 30, 2017 (and in fact ample evidence that they did so for retaliatory reasons). [The City] also acted arbitrarily when [it] made certain promotions effective on May 8, 2017, from the Apparatus Operator list that was to be effective from November 22, [2016], to November 21, 2017, but then failed to promote Appellants off that same list (or similar lists) in September 2017.

Appellants asserted a declaratory-judgment claim based on the deprivation of due course of law in cause of action six of their third amended petition.

The linchpin of the analysis is whether the party asserting the due-course claim has a property interest that creates a due-course protection: "Absent a property interest, there is nothing subject to due[-]process protections[,] and our inquiry ends." *Cabrol v. Town of Youngville*, 106 F.3d 101, 105 (5th Cir. 1997).

Appellants and the City argue that there are bright lines that either support or negate the interest necessary to support a due-course claim. Appellants assert that "[i]t is well established that an individual whose promotion is imminent due to [his] position on a promotional list has established rights." The City responds with cases holding that there is no property interest in a promotion.

Opinions cited by the City and others support the argument that the prospect of promotion does not create the necessary property interest.[19] For example, the Austin

---

[19]The City cites *McEnery v. City of San Antonio*, No. SA-10-CA-0115-FB, 2011 WL 13234329, at *10 (W.D. Tex. Sept. 28, 2011) (order). *McEnery* contains language that rejects a due-process claim predicated on a promotion:

> Likewise, the plaintiffs here have not provided this [c]ourt with any authority to support a created property interest in their promotion. As a result, their due[-]process claims also fail. [*Gentilello v. Rege*, 627 F.3d 540, 545 (5th Cir. 2010)]; *see Hernandez v.* [*City of*] *Corpus Christi*, [820 F. Supp. 2d 781, 812] n.20 (S.D. Tex. [2011]) [(order)] (plaintiff did not assert property interest in promotion nor allege[] any "legitimate claim of entitlement to a promotion under existing laws"); *Curtis v. Univ*[.] *of Hous*[.], 940 F. Supp. 1070, 1078 (S.D. Tex. 1996) (professor had property interest in status as a tenured professor but no property right to a promotion); *City of Round Rock v. Whiteaker*, 241 S.W.3d 609, 625 (Tex. App.—Austin 2007, pet. denied) [(op. on reh'g)] (noting a "person's position as the top candidate on a promotional[-]eligibility list, while conferring a statutory primary right to promotion, does not create an equitable property interest

Court of Appeals dealt with the question of whether a firefighter had a property interest in a promotion because of his placement on a promotion-eligibility list created under a civil-service system. *Whiteaker*, 241 S.W.3d at 625. The court agreed with the argument that the firefighter's presence on the eligibility list did not create a property interest:

> But as Whiteaker observes, a person's position as the top candidate on a promotional[-]eligibility list, while conferring a statutory primary right to promotion, does not create an equitable property interest in promotion. *See Firemen's & Policemen's Civil Serv. Comm'n of City of Fort Worth v. Williams*, 531 S.W.2d 327, 330 (Tex. 1975); *Firemen's & Policemen's Civil Serv. Comm'n of City of Fort Worth v. Kennedy*, 514 S.W.2d 237, 239–40 (Tex. 1974); *see also* [*City of Amarillo v.*] *Hancock*, 239 S.W.2d [788,] 791–92 [(Tex. 1951)] (fire captain had no vested property interest in position under civil[-]service act that could give rise to inherent right to appeal from demotion)[.] [*B*]*ut see City of Fort Worth v. Nyborg*, 999 S.W.2d 451, 457 (Tex. App.—Fort Worth 1999, pet. denied) (describing interest of top candidate as "an equitable property right in th[e] vacated position and a primary right to promotion").

*Id.*

Though there are no Texas cases on point, other jurisdictions suggest a more nuanced analysis of the question and do not draw the lines advocated for by the parties in this case. A seminal Ninth Circuit case noted, "To have a property interest, 'a person clearly must have more than an abstract need or desire.'" *Nunez v. City of L.A.*, 147 F.3d 867, 872–73 (9th Cir. 1998) (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S. Ct.

---

in promotion" and rejecting the City's argument that such an interest was conferred).

*Id.*

2701, 2709 (1972)). "A mere 'unilateral expectation' of a benefit or privilege is insufficient; the plaintiff must 'have a legitimate claim of entitlement to it.'" *Id.*

Here, Appellants rely on two sources to create their "established right" to promotion. First, they reference Chapter 143. As we have explained in detail above, Appellants cannot claim an established right to promotion under the provisions of Chapter 143 when the civil-service system had not been implemented and when the eligibility list that is the source of their claim of right was not created in accordance with that chapter. *See* Tex. Loc. Gov't Code Ann. § 143.036 (establishing criteria for creation of promotion-eligibility list).

With respect to the recurring theme of Appellants' rights under the SOP, the City points out that the manual containing the SOPs provides that "[t]hese policies are in no way intended to create entitlements for non-City employees nor are they the basis for entitlements to City employees except as expressly provided in the written directive or as may be directed by the [f]ire [c]hief, [h]uman [r]esources [d]irector, or [c]ity [m]anager." The manual also provides that

> [t]he Department reserves the authority to modify, revoke, suspend, interpret, terminate, or change any or all of the polic[i]es specified in this [m]anual, or procedures published pursuant to its authority, in whole or in part at any time, with or without notice. The issuance of this [m]anual does not constitute a contract between the City and its employees.

As we will discuss below, we conclude that the SOP manual does not create a contract. As one commentator has explained the application of federal law, provisions in employment manuals are often rejected as sources of protected property interests:

83

"If state law does not enforce implied contracts based on the unilateral promises made in employee handbooks or allow direct enforcement of the handbooks themselves, then the employee will not have a protected property interest as a matter of federal law, no matter what the employer has promised." *See* 1 Employee and Union Member Guide to Labor Law, § 2:17 (May 2021 update). Though not in the context of property interests but in the context of contract claims, Texas law follows this principle. *See City of Denton v. Rushing*, 570 S.W.3d 708, 713 (Tex. 2019). With the disclaimers highlighted by the City, we conclude that the promotion scheme specified in the SOP manual did not create a property interest that was sufficient to entitle Appellants to a due-course-of-law claim.

For the sake of completeness, we note that Appellants cite our statement in *Nyborg* that an eligibility list created pursuant to Chapter 143 creates an "equitable property right." 999 S.W.2d at 457. Whether the statement in *Nyborg* is correct is not a question that we need to answer. Again, the promotion list that Appellants rely on as the source of their property right was not created pursuant to Chapter 143.

We overrule Appellants' eighth issue.

## I. The trial court did not err by granting summary judgment on Appellants' claim for breach of contract.

In their ninth and final issue, Appellants contend that the trial court erred by granting summary judgment on their breach-of-contract claim. Recognizing that the City is protected by governmental immunity unless Appellants can establish that a

unilateral contract was created between them and the City, Appellants ground their claim for the existence of the contract on the promotion provision of the SOP. But in implicit recognition that a disclaimer of contractual intent contained in the SOP undermines a reliance on that document as a contract, Appellants also point to an email sent by an assistant fire chief as a promise to promote in accordance with the SOP. That email fails to create a contract because the terms of the email are so hedged that the email does not constitute a promise to perform in a particular manner.

Again, "[c]ities enjoy governmental immunity when they are performing governmental functions." *Rushing*, 570 S.W.3d at 710. The Local Government Code establishes a waiver of immunity from suit for certain breaches of contract:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

Tex. Loc. Gov't Code Ann. § 271.152. The Local Government Code goes on to describe the types of contracts that are subject to the waiver provision, including "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." *Id.* § 271.151(2)(A).

The Texas Supreme Court has enumerated the elements of a contract that waives immunity as "(1) the contract must be in writing, (2) state the essential terms of the agreement, (3) provide goods or services, (4) to the local governmental entity, and (5) be

85

executed on behalf of the local governmental entity." *City of Hous. v. Williams*, 353 S.W.3d 128, 135 (Tex. 2011). The doctrine of unilateral contract often underpins the contract claim based on the theory that "a unilateral employment contract is created when an employer promises an employee certain benefits in exchange for the employee's performance, and the employee performs." *Id.* at 136.

The supreme court recognized the possibility that a policy and procedure manual or employee handbook may constitute a contract. *Rushing*, 570 S.W.3d at 712. But disclaimers within the document may negate the intent to form a contract. *Id.* In its recent examination of a disclaimer, the supreme court noted that courts have often times parsed the terms of the disclaimer to decide whether it was a blanket disclaimer of contractual intent or a disclaimer of only certain types of compensation. *Id.* at 712–13. The supreme court concluded that a policy and procedure manual, which stated that "[t]he contents of this manual do not in any way constitute the terms of a contract of employment," was the type of broad general disclaimer that was "a valid means to negate contractual intent." *Id.* at 712.

Here, the SOP manual contains a broad general disclaimer: "The issuance of this [m]anual does not constitute a contract between the City and its employees." Thus, the four corners of the SOP manual do not create a contract because they negate in unqualified terms the intent to create a contract.

To sidestep the disclaimer, Appellants reference other communications from the fire chief and an assistant fire chief. In Appellants' opening brief, they refer to an email

86

from an assistant fire chief, which we previously quoted and which was dated shortly

before the decision to withdraw the promotional lists that stated,

> The purpose of this email [is] to alleviate any concerns or anxiety with members on existing or future promotional lists or processes. Today[,] I cancelled promotional interviews by direction of the [f]ire [c]hief[] so [that] we can assess our current and future promotional policy. We are well aware of the potential impact of not promoting appropriately as it relates to our continuity of government operations and for members on a list or on future candidates.
>
> We will promote as soon as we have determined the best course of action to reduce any risk to the organization and also follow through on promoting members that have worked hard to make a current list or to compete in the near future.
>
> In other words, some promotions may be delayed outside of our regular practice in order to accomplish risk management needs. It is our intention, however, to utilize any existing list until October 30th, at the very least. I'm working hard this week to make a final determination with Command Staff, Human Resources[,] and the City Attorney's Offices.

Appellants characterize this email as expressing that under the circumstances, "[the

City] clearly had the intention[—]as expressed in writing[—]to bind themselves to the

existing promotional policy through October 30, 2017, in exchange for the fire fighters'

continued service."

In their reply brief, Appellants do not mention the quoted email but turn to an

August 31, 2017 "Straight from the Chief" memo that states,

> The last date to su[b]mit retirement notice paperwork for retirement benefits under the current City of Arlington benefit plan is September 30th. The retiring employee will have to be retired before October 30th.
>
> This announcement assumes that Chapter 143 will be implemented with no adjustments.

> I've committed to keep you as aware (as possible) about information impacting your personal decision making. I will share new information with you as it materializes.

Again, Appellants argue that this memo created a contract based on the terms of the SOP manual irrespective of its disclaimer because the memo was a representation that the City would abide by the SOP manual:

> Indeed, subsequent to the issuance of the SOP [m]anual, [the City] led [its] employees to believe that they would retain the benefits of its provisions through October 30, 2017, should they elect not to join the exodus of retirees that the City was facing. The backwards-looking disclaimer of contractual intent does nothing to "negate the intent" of the [City] who deliberately assured [its] employees that the promotional lists would be in place through the end of October 2017, and the Appellants, who decided to forego the opportunity to cash out their leave banks and retire from the department before September 30, 2017.

In essence, Appellants' argument is that the City promised to promote in accordance with the procedure specified in the SOP manual if the firefighters would not resign before the transition to the civil-service promotion scheme. The underlying principle that Appellants rely on is not flawed because in the employment context, a unilateral contract "is created when an employer promises an employee certain benefits in exchange for the employee's performance, and the employee performs." *See Williams*, 353 S.W.3d at 136. Instead, what is lacking is more than a scintilla of evidence of a promise not to alter the SOP manual's method of determining promotions before the transition to the civil-service promotional scheme.

88

To take the simpler case first, the "Straight from the Chief" memo says nothing about promotion. It references retirement benefits. Nothing in the memo contains any commitment by the City with respect to promotion.

The email from the *assistant* fire chief presents a closer question. The email references an "intention" to promote from an existing list "until October 30th, at the very least." But the email also contains a number of phrases showing that the email is not an unalterable promise to promote from the existing list. The email states that the City's determination of how to promote will be made "as soon as [it had] determined the best course of action to reduce any risk to the organization." The paragraph stating the intention to promote in accordance with the then-existing list begins with the qualifier that "some promotions may be delayed outside of our regular practice in order to accomplish risk management needs." And the email states that the assistant fire chief was "working hard . . . to make a final determination with Command Staff, Human Resources[,] and the City Attorney's Offices." Any suggestion that the email offers that the then-existing promotion list would be used is qualified by its statements that other City departments were involved in the decision and that other considerations might factor into the process. With these qualifiers, the email does not rise to a level that the City would do X (promote in accordance with the existing list) if the firefighters would do Y (not resign). It is not a scintilla of evidence of an offer that the City would promote in accordance with the then-existing list if the firefighters did not resign.

We overrule Appellants' ninth issue.

89

## VI.  Conclusion

We have now finished our journey.  Having sustained a portion of Appellants' first two issues, we reverse and remand Appellants' two surviving retaliation claims, which are based on claims that the City retaliated against the firefighters by failing to promote or delaying promotions and by cancelling certain types of discretionary pay previously paid to the firefighters.  With respect to the surviving retaliation claims, we further hold that the trial court erred when it held that the Association lacked standing to assert those claims.  Having overruled Appellants' third through ninth issues, we affirm the remainder of the trial court's summary judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  September 16, 2021